Theodore R. DUSANENKO, Nicholas A.
Longo and Robert M.
Maidman, Plaintiffs,

v.

John R. MALONEY, Charles E. Holbrook,
William J. Carey and the Town of
Clarkstown, Defendants.

No. 82 Civ. 2223–CLB.

United States District Court,
S.D. New York.

April 5, 1983.

Edward Costikyan of Paul, Weiss, Rifkind, Wharton & Garrison & Robert Diubaldo of Wilson, Elser, Edelman & Dicker, New York City, for defendants.

David MacRae Wagner of Freedman, Wray, Wagner, Tabakman & Weiss, New City, N.Y., for plaintiffs.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

The scenario for this § 1983 civil rights action begins with the 1981 elections in the Town of Clarkstown, Rockland County, New York. The primary players are plaintiff Theodore Dusanenko, a Republican, Town Supervisor since 1980, plaintiff Nicholas Longo, the Conservative-Republican candidate for Town Councilman and defendant William Carey, the Republican can-

didate for the same position. Although Dusanenko, Carey and Longo were all, nominally at least, of the same political persuasion, they did not campaign together, evidently because of philosophic differences and because Dusanenko had not supported Carey in his bid for the Republican nomination. Dusanenko and Longo presented themselves to the voters as a team, while Carey campaigned alone.

In the general election held on November 3, 1981, Dusanenko was re-elected Town Supervisor for a two-year term. Defendant Carey was elected a Town Councilman for a four-year term, as was defendant John R. Maloney, one of the Democratic candidates. Longo was defeated in his bid for re-election.

The terms of office of Dusanenko, Carey and Maloney commenced on January 1, 1982. The Town Board of a town of the first class, such as Clarkstown, consists of one supervisor, who presides, having a two-year term, four councilmen, having four-year terms, two of whom are elected at each biennial town election in November of the odd numbered years (except in Broome County) and a Town Clerk, who has no vote, elected for a two-year term. Accordingly, after January 1, 1982, the voting power of the Town Board of Clarkstown was vested in Dusanenko, Carey and Maloney, together with Edward Lettre, a Republican, and defendant Charles F. Holbrook, a Democrat, incumbent councilmen whose four-year terms will expire in December 1983.

In early January 1983 the Town Board held a reorganizational meeting, as it does following any election. By a majority vote of defendants Maloney, Holbrook and Carey, the new Board set the salaries of Supervisor Dusanenko and his newly appointed Confidential Secretary, defeated former councilman Nicholas Longo.

Authority for the appointment of a "Confidential Secretary" is found in New York Town Law, (hereinafter "Town Law") § 29(15). The appointment is made solely by the Supervisor, to serve at his pleasure, although the salary is fixed by Town Board resolution. The position is in the "Exempt" class under the New York Civil Service Law, § 41. All other appointed officials in town government are hired by vote of the entire Board, and are generally classified as in the "competitive class," in that appointment must be made from a current certified list of the civil service commission of those who passed a competitive examination, or in the "non-competitive class" in that the appointee must satisfy certain objective criteria as to education and experience but need not pass a civil service examination. All elected officials are in the "exempt" class. See generally, New York Civil Service Law, § 41.

The salaries approved by the Town Board for 1983 were considerably lower than those paid in 1981; the Supervisor's annual salary was reduced from $39,000 to $20,000 and the salary for the new Confidential Secretary was lowered from $15,730 paid to the predecessor, to $7,500.

The same Town Board majority also declined to reappoint plaintiff Robert Maidman, Esq., as deputy town attorney, and instead appointed Paul Nowicki, Esq. Nowicki, who is conceded to be eligible and qualified for the appointment, turns out to be the son of Catherine Nowicki, defendant Carey's campaign chairman in the 1981 election.

Plaintiffs characterize the majority votes as "politically vindictive" with regard to plaintiffs Dusanenko and Longo, and as evidencing a "callous disregard for the rights" of plaintiff Maidman. Moreover, plaintiffs claim that the actions taken by the defendants, acting both individually and in their official capacity as the Town Board, violate plaintiffs' rights pursuant to 42 U.S.C. § 1983 and the First and Fourteenth Amendment to the Constitution of the United States. Plaintiffs seek a judgment in the nature of a mandatory injunction, requiring restoration of the salary of Dusanenko to the level at which he was paid in 1981 and commanding that Longo be paid at the 1981 level of pay of his predecessor as Confidential Secretary, Mrs. Doris Fo-

gel;[1] as well as the reappointment of Maidman as Deputy Town Attorney. Plaintiffs also seek punitive damages and attorneys fees. To attain this relief, they seek to bring their grievances within the rubric of 42 U.S.C. § 1983, and would have this federal court, by injunctive relief and the award of compensatory and exemplary damages, undertake to restructure the affairs of town government in Clarkstown to their greater advantage. We consider below whether the relief sought may be obtained based on this complaint and relying on the Civil Rights Law of 1871.

Defendants seek summary judgment in their favor pursuant to Rule 56, F.R.Civ.P. Principally they contend that their actions were lawful, and were undertaken by them in a "legislative" capacity. They argue that they are absolutely immune from suit under 42 U.S.C. § 1983 upon the undisputed facts pleaded or admitted here.

We set the stage for our discussion by describing local town government in New York State. In doing so, we call upon the common knowledge of a resident of Upstate New York, where a principal industry and substantial payroll is Government. We rely also on the interesting brief account of the late Hon. Frank C. Moore of Kenmore, New York, entitled "Early History of Town Government in New York State," authored in 1933 upon recodification of the Town Law, now found in the preface to Volume 61 of McKinney's New York Statutes Annotated. Later Lieutenant Governor of New York, Moore also served as head of the Office of Local Government of the State of New York. A skilled municipal lawyer, Governor Moore was generally regarded as the guardian and protector of the small units of local government in New York. He is also author of the aphorism that "Home Rule is the right to be misgoverned by our friends and neighbors."

The "Dukes Laws" imposed in 1665 by Governor Nichols in the name of the Duke of York to govern the vast area ceded to the Duke by his brother Carolus Rex, provided for a restructuring and confirmation of local town government as it had theretofore existed, including police, defense and tax powers, local courts and the right of freeholders to vote in town meetings and to legislate. Property taxes, for the relief of the poor, were first assessed in New York by the colonial legislature in 1683. These taxes were administered on a town wide basis. An act of that year provided for election in each town of a "Town Treasurer." That official was the predecessor of the Town Supervisor, the position now occupied by plaintiff Dusanenko in this case with respect to the Town of Clarkstown.

The independent State of New York adopted its first Constitution at Kingston, in Ulster County in 1777. That document recognized the existing chartered cities of Albany and New-York, and fourteen pre-existing counties. It made no mention of the existing towns, which continued to function, but authorized future state legislatures to divide the state "into such other and further counties and districts as may then appear necessary" for the "advantage and conveniences of the good people." (Const. of 1777, Art. XII).

The state legislature interpreted this provision as authority for the creation of additional towns by specific statutory enactment.[2]

Towns in New York have no inherent powers and possess no sovereignty. As was held in Holroyd v. Town of Indian Lake, 180 N.Y. 318, 322, 73 N.E. 36 (1905) "the existence and power of a town depend to no extent upon the common law, but wholly upon the will of the legislature."

---

1. After the election, Dusanenko terminated Mrs. Fogel, described as a person who performed "secretarial and administrative tasks" (Affidavit of William Carey, sworn to June 4, 1982, ¶ 14). The inference is inescapable that he did so to find a job for a lame duck councilman, Longo, a practice not unheard of in local government.

2. The Legislature also established the first villages in 1798 (Troy and Lansingburgh). The Town of Clarkstown was erected in 1791 from a part of the Town of Haverstraw, established by the Legislature in 1788. As of 1981 there were 931 towns in the State.

Because in each biennial town election two councilmen and the supervisor are elected, it can be seen that at any town election, by choosing a new supervisor and two new councilmen, it is possible for the voters to impose political accountability and, in effect, throw the rascals out, altering the political complexion of the town government. And they do so regularly. It is also readily apparent that a supervisor has a natural adverse position with respect to those two councilmen who will not have to face the electorate as soon as the supervisor will.

The supervisor's duties and powers are found in the Town Law, §§ 29(1)—29(16). Generally, in addition to presiding at meetings of the town board, of which he is a voting member, the supervisor also serves as chief fiscal officer of the town. In former years, he was ex officio a member of the County Board of Supervisors, the governing body in county government, New York's next highest level. Because all towns are not of the same size or population, the advent of the "one man-one vote" concept ended this aspect of the supervisor's work.

The town board as a body has budgetary authority. The supervisor prepares a tentative budget for each calendar year, which is adopted, as changed or modified, after a public hearing, by a majority vote of the town board. By board resolution the salaries and job titles (subject to the Civil Service Law where applicable) are designated.

While the public responsibilities of a Town Supervisor are substantial, his position is not necessarily a full-time occupation in most places. Clarkstown, according to the 1980 federal census, had a town-wide population of 77,091. Of these residents, approximately 4,572 resided in incorporated villages located wholly or in part within the town. These include the Village of Upper Nyack, located entirely within Clarkstown (Pop. 1,906), and a part of the Village of Spring Valley, located principally in the adjoining Town of Ramapo, and a part of the Village of Nyack, located principally in the adjoining Town of Orangetown. Some, but not all, municipal services are provided to village residents by town government.[3]

The statute is silent with respect to whether the Town Supervisor's position should be full-time. There is enough to be done in local government in most places so that a supervisor could make his work a full-time occupation, but only in towns much larger than Clarkstown is this arrangement essential.[4]

Presumably a town board in fixing salary could require an engagement from the supervisor to work full-time. However, most town supervisors tend to have concurrent unrelated employment, probably because there is no job security in a two year term of office.

We consider below the separate issues raised by defendants in support of their motion.

3. Routine services rendered for the benefit of the inhabitants of incorporated villages by town government include the conduct of all elections other than those for village or school district office, the assessment for and collection of all state, county, town and judicial district taxes, and issuance of marriage licenses. Other services may be rendered jointly, or by a town for village residents pursuant to agreement between that town and village, or by local custom. Such optional town services include joint recreation or senior citizen programs, special districts for water supply, sewer service and refuse collection, and the collection of village taxes by town employees, and similar efforts.

4. The New York towns range in their size and responsibility from the Town of Montague in Lewis County, having a population in 1980 of 32 persons, to the Town of Hempstead in Nassau County, population 738,517, which is larger than Buffalo, the second largest City in the State. Hempstead, because of its size and the complexity of its affairs, has two town supervisors, one of whom is known as the Presiding Supervisor, a post occupied recently by the Hon. Alphonse M. D'Amato, now United States Senator.

A town is an involuntary political subdivision established by the legislature, while a village results from voluntary incorporation by the residents and may be dissolved in much the same way as it was formed. All land in New York outside the limits of a city lies within a town. A town is always wholly within a single county. In contrast, there are many villages which lie in more than one town, and one village (Saranac Lake) lies within two counties.

*Immunity for Legislative Acts*

Defendants assert that their decisions as a majority of the Town Board in legislative areas are absolutely immune from action under the Civil Rights laws.

This concept of absolute immunity for legislators is well grounded in our legal history. It has roots in 17th century England when, after a bitter struggle, Parliament forever prohibited the prosecution of its members for speeches made in its chambers. *See* 1 Wm. & Mary Sess. 2 c.II; *Tenney v. Brandhove,* 341 U.S. 367, 372, 71 S.Ct. 783, 786, 95 L.Ed. 1019 (1951). Our nation expressed its commitment to freedom of speech and action in matters legislative by the guaranties found both in Article V of the Articles of Confederation, and in Article 1, Section 6 of the Constitution. Many states, including New York, have incorporated into their state constitutions specific provisions protecting the privilege.

In *Tenney v. Brandhove, supra,* the Supreme Court recognized an absolute immunity from suits for damages under 42 U.S.C. § 1983 for state legislators acting within the legislative sphere.

As noted earlier, the relief sought by plaintiffs Dusanenko and Longo may be characterized as seeking damages in the amount of the salary not paid, or in the alternative, as seeking an injunction to compel the Town Board to enact a legislative resolution restoring the salaries claimed to be appropriate. The characterization of this relief, whether as damages or as injunctive, is unimportant for purposes of legislative immunity. In *Supreme Court of Virginia v. Consumers Union of the United States,* 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980), the Supreme Court held that its holding in *Tenney v. Brandhove, supra* was equally applicable to § 1983 actions seeking injunctive or declaratory relief, as it is to those cases in which damages at law were demanded. *Id.* at 732, 100 S.Ct. at 988.

Although § 1983, by its terms, appears not to permit any exceptions to its provisions, in *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976)

the Court found that Congress "would not have impinge[d] upon a tradition so well grounded in history and reason" without the use of specific language. *Id.* at 376, 71 S.Ct. at 788.

In *Lake Country Estates v. Tahoe Regional Planning Agency,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979), the Court extended this immunity to appointed members of a regional planning agency. In *Lake Country* the Court held that the immunity for legislative activities was not based on the Speech and Debate Clause of the Constitution, but on a recognition of the need to permit legislators to proceed freely in the discharge of their duties, uninhibited by the fear of legal action. Moreover, the Court found this need to protect legislators for "the public good" to be equally applicable to federal, state *and* regional (less than state-wide) legislators. *Id.* at 404–05, 99 S.Ct. at 1178–79.

The issue presented in this case, whether *local* legislators should be similarly immune, was expressly left unresolved by the Court. Nor has the question been presented to the Second Circuit. However, the Fourth, Fifth and Eighth Circuits and at least one District Judge within this Circuit have held that local legislators are absolutely immune from suit for actions taken in their legislative capacity. *Hernandez v. City of Lafayette,* 643 F.2d 1188 (5th Cir.), *rehearing denied,* 649 F.2d 336 (5th Cir.1982), *cert. denied,* 455 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982); *Bruce v. Riddle,* 631 F.2d 272 (4th Cir.1980); *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607 (8th Cir. 1980); *Goldberg v. Village of Spring Valley,* 538 F.Supp. 646 (S.D.N.Y.1982). In each case, the court looked to the reasoning relied upon by the Supreme Court in *Tenney* and *Lake Country,* namely, the historical basis of the immunity and the function it plays in our system of government. It found "no material distinction between the need for insulating legislative decision making at the state or regional level and a corresponding need at the municipal level." *Gorman Towers, supra,* at 612. This Court agrees.

Those who are charged with the conduct of government in our cities and towns must have that same freedom to carry out their responsibilities as their consciences demand, free from the fear that political disagreements may result in legal actions.

As Justice Frankfurter said in *Tenney*, "[i]n times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and are as readily believed. Courts are not the place for such controversies. Self discipline, and [recourse to] the voters must be the ultimate reliance for discouraging or correcting such abuses." *Tenney, supra,* 341 U.S. at 378, 71 S.Ct. at 789.

In our discussion below, we note that the defendants suggest pure motives for their legislative actions which have the ring of truth. See *infra* p. 829. Short of a complete trial, preceded by the usual expensive, costly, harassing and wasteful pre-trial discovery, which has become unavoidable in the federal trial courts, it is impossible to ascertain whether the invidious motives attributed by plaintiffs to the legislative conduct in this case are warranted by the facts. Obviously, if the voters in this relatively small suburban and rural community think that a transitory majority of its Town Board dealt unfairly with Dusanenko, Longo or Maidman, it can vindicate their interests at the next Town election. Not every arguably wrong decision made by local legislators is susceptible of redress in the federal courts.

Town Law § 27 provides:
"The town board of each town shall fix from time to time, the salaries of all officers, officials and employees of said town, whether elected or appointed."

Section 29(15) permits a supervisor of a town of the first class to designate a confidential secretary and the person so designated "shall receive a reasonable compensation for his services, to be fixed by the town board." Section 20(2)(a) states: "A town of the first class shall have the authority to appoint such deputies in the office of the town attorney .... The terms of such office shall be indefinite and the appointee thereto shall serve at the pleasure of the town board."

■ The actions complained of here were well within the scope of the Town Board's authority as outlined in the above quoted sections of the Town Law. Clearly the Town Board functioned in a legislative capacity, performing at a local level, tasks similar to those that in New York are carried out by the State Senate and Assembly.

Insofar as concerns the salary of Longo, this Court does note that the state statute requires the Town Board to fix a "reasonable" compensation. Probably, under New York State law, a failure of the Town Board to fix a *reasonable* salary for Longo is cognizable in a special proceeding in the nature of mandamus to review, commonly referred to as an "Article 78 Proceeding." See New York CPLR § 7803(3). Certainly there is no federal interest and no need for this Court to exercise pendent jurisdiction over such a state claim. We find no reported decisions adjudicating the issue where the supervisor of a town came into conflict with a majority of his board over the level of salary of his confidential secretary. However, a published opinion of the Attorney General of New York in 1979 (No. 391) holds that a town board is obligated to pay a reasonable salary to the supervisor's wife, should he choose to appoint her as Confidential Secretary.

This Court concludes therefore that members of a town board, when acting as local legislators in a capacity comparable to that of members of a state legislature, are entitled to absolute immunity from liability under § 1983, and that they were so acting in setting the salaries for Dusanenko and Longo, or failing to reappoint Maidman.

■ Defendants also argue that the Town of Clarkstown itself is also immune from suit, as a result of the Supreme Court's decision in *Owen v. City of Independence, Mo.,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). However, defendants have misread the applicable law.

In *Owen* the Court held that a municipality was not immune from suits under § 1983 for alleged constitutional violations by members of its city council. Defendants attempt to distinguish the instant case by stating that the Court in Owen, while finding the "municipal corporation" without immunity, reaffirmed that other *entities* cannot be sued if there is historical immunity. The language of the passage cited by defendants does not support this argument. Indeed, the Court noted that while it had recognized and reaffirmed immunity for various government *officials,* it had not previously addressed the issue of the immunity of the municipality itself. *Id.* at 637–38 and fn. 18, 100 S.Ct. at 1408–09 and fn. 18.

Moreover, the rationale underlying the decision does not support the recognition of immunity for the town itself. The Court held that the central aim of the Civil Rights Act of 1871 was to provide those wronged by persons cloaked with the power of the state, with a remedy against the offending party. *Owen, supra,* at 650–51, 100 S.Ct. at 1415. Because the Court has recognized an absolute or qualified immunity for most government officials, a finding of immunity for the municipality itself might leave the injured party without a remedy, thereby thwarting the intent of Congress. *Id.* at 651, 100 S.Ct. at 1415. In this case, the individual defendants are absolutely immune from suit, see *supra,* p. 827; it would therefore contravene the purpose of § 1983 as interpreted by the Supreme Court to find the town itself without liability for constitutional violations.

Finally, the public good protected by allowing immunity for public officials, permitting them to govern without fear of personal liability, will not be served by the creation of municipal immunity since the recovery, if any, comes from the pockets of the taxpayer rather than from the officials who acted improperly.

*Failure to State a Claim*

■ Essentially plaintiffs found the political aspect of their case on two recent Supreme Court cases, *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) and *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), discussed below. In these cases the Supreme Court sought to stamp out those residues of the nineteenth century political "spoils system" which led to wholesale firings of lower level public employees when the administration of the hiring authority changed from control by one political party to another.

In *Branti* the Court held that a *dismissal* based *solely* upon political beliefs was unconstitutional unless the "hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* 445 U.S. at 519, 100 S.Ct. at 1295. However, the Court specifically noted "[t]o the extent that [the employer] lacks confidence in the [employees] he has inherited from the prior administration for some reason other than their political affiliation, he is, of course, free to discharge them." *Id.* at 520, n. 14, 100 S.Ct. at 1295, n. 14; *Elrod v. Burns,* 427 U.S. 347, 366, 96 S.Ct. 2673, 2686, 49 L.Ed.2d 547 (1976) ("employees may always be discharged for good cause").

It is to be noted that *Branti* and *Elrod* represented cases involving firings based simply on membership in that one of the two traditional parties, Democratic or Republican, temporarily ousted from power. Since the foundation of our Republic and going back to the dawn of the nineteenth century, the days of Aaron Burr and the founding of Tammany Hall, political party affiliation has been regarded as relevant to municipal employment. This Court believes that in the light of our successful history in local government the mischievous reforms of *Branti* and *Elrod* should not be extended beyond the express and precise directions of the Supreme Court.

The case here, viewed most favorably to the pleader, is not a situation of Democrats against Republicans or vice versa. It is at most internecine friction or bad blood. The evidence here, based upon the uncontradicted affidavit submitted by William J. Carey, sworn to on June 4, 1982, concurred in by the affidavits of John R. Maloney and Charles E. Holbrook, each sworn to June 4,

1982, demonstrates that to the extent there may be any invidious motivation of the sort alleged, it reaches across party lines.

The majority which took the allegedly unconstitutional action consisted of Councilmen Maloney and Holbrook, who are Democrats and Councilman Carey, a Republican. The vote to reduce the salaries affected one Republican, Dusanenko, and one Conservative, Longo. The newly appointed Deputy Town Attorney, Paul Nowicki, is also a Republican. The political affiliation of Maidman is apparently also Republican (a fact inferred by the Court from the oblique statement at Def'ts' Memo., p. 11). These were not instances in which decisions were made based solely on political party affiliation.

Moreover, based upon the pleadings and defendants' Rule 3g Statement filed on June 7, 1982, there are sufficient undisputed facts to find that the actions were motivated at least in part by a genuine concern for the proper operation of the town's business, rather than "political vindictiveness."

In 1981 the salary of plaintiff Dusanenko had been increased from $29,000 to $39,000 at his request because he had taken a leave of absence from his position as a high school teacher, and was devoting full time to his role as Town Supervisor. However, after the November 1981 elections Dusanenko returned to teaching, and began to work only part-time in the Supervisor's position. In the interim he had also been elected to the County Legislature at a salary of $10,000 a year. Thus his combined income from personal services exceeded $80,000, greater than that of this Court, or of the Chief Judge of the New York Court of Appeals ($78,750); the Lieutenant Governor ($60,000); or the Mayor of the City of New York ($60,000).

Is it any wonder that a majority of the Town Board thought it was appropriate to reduce the Supervisor's salary to an amount commensurate with his time commitment and responsibility? See Resolution of Town Board No. (11–1982), Exhibit 2 to Defendants' Notice of Motion filed June 7, 1982. The decision on its face was based on prac-tical considerations, not "political vindictiveness."

It is at most speculative to suggest that the new majority of the Town Board in 1982 would have permitted a continuation of these excessive earnings if more friendly disposed personally or politically towards Dusanenko. No evidence has been presented to support an inference that "politics," rather than a reasonable concern for the interests of the hard pressed taxpayer and the poor appearance of such excessive total earnings, moved the Town Board.

Also, the appointment of Nicholas Longo as Confidential Secretary changed the nature of the office. In the previous administration the position had been held by a "capable secretary" who had administrative and clerical responsibilities. There was no indication whether Longo would be capable of performing similar secretarial tasks, and, moreover, the Board believed it would appear inappropriate to pay Longo a salary which was almost double that he would have earned as a councilman. (Carey Affidavit, ¶ 14). These legitimate concerns rather than political considerations were at least partly responsible for the reduction in Longo's salary.

Here again, it is at most speculative to suggest that if a majority of the Town Board were more friendly disposed towards Longo, they would have paid him the same salary of the experienced prior incumbent. To the extent that the Town Law requires that the salary be reasonable, Longo had an adequate remedy at law in the state courts, as we have noted *supra,* p. 827.

There were more than sufficient non-political reasons to support the decision not to reappoint plaintiff Maidman as Deputy Town Attorney. Maidman has been the subject of three separate judicial proceedings in the last ten years. In 1973, while serving as Town Justice for the Town of Clarkstown, an elective position, he was censured publicly for attempting to influence the disposition of a criminal matter pending against his law partner. *In the Matter of Maidman,* 345 N.Y.S.2d 82, 42 A.D.2d 44 (1973). In 1978 Maidman was

sued by the Securities and Exchange Commission for allegedly defrauding a public company of which he was a director and majority shareholder. As a result of that action Maidman entered into a consent decree. *SEC v. Maidman,* 78 Civ. 4971–CSH (S.D.N.Y. October 20, 1978). Most recently, Maidman was suspended for four months from his position as Town Justice of Clarkstown for improperly reducing or dismissing traffic offenses pending before his court. *In the Matter of Maidman,* 47 N.Y.2d cccc (Ct. on the Judiciary 1979).

Plaintiffs argue that these judicial proceedings could not have been the basis for the failure to reappoint, because each occurred before Maidman's original appointment in 1980 by the prior administration. (Plaintiffs' Memorandum filed June 21, 1982, at 2). This argument is not necessarily conclusive. It appears that the 1980 Town Board chose to appoint Maidman as Deputy Town Attorney despite these controversies. However, the 1982 Town Board, with a different membership, was certainly justified in *its* finding that "Maidman's background did not commend him for reappointment." (Defendants' Memorandum filed June 7, 1982 at 12).

The Deputy Town Attorney serves at the pleasure of the Town Board, Town Law § 20(2)(a), and the newly elected Town Board was warranted in exercising its prerogative in declining to reappoint Maidman for the reasons stated, and finding a replacement.

Furthermore, the Court doubts that the Office of Town Attorney or Deputy Town Attorney is analogous to that of a public defender, dealt with in *Branti, supra.* Town Boards have a habit of turning every public issue into a legal question, and avoiding the political heat from the public, by requiring an opinion from the Town Attorney, or by telling the voters that they would follow some requested course of conduct had they only the power to do so, but that to do so would be illegal.

This is a time worn dodge in town government; often not without a factual basis, since a town government has limited statutory powers.

The Town Attorney and his deputies are so closely affiliated with policy matters that it is reasonable that the offices be filled with persons of the same political persuasion as the majority on the Town Board. The State of New York has recognized this by making the office "Non-competitive" under the Civil Service Law, and by providing that those appointed serve at the pleasure of the Town Board.

It is hard to imagine a more intimate relationship than that of attorney-client. In *Branti* the clients were not the appointing authority, but the indigent persons charged with crime. But here the client is in effect the administration itself. This Court believes that the office of Town Attorney or Deputy Town Attorney is such that it is exempt from the rule of *Branti, supra.* See *Ness v. Marshall,* 660 F.2d 517 (3rd Cir.1981) (permitting dismissals of city solicitor and assistants); *Bavoso v. Harding,* 507 F.Supp. 313 (S.D.N.Y.1980) (same for city corporation counsel); and *Catterson v. Caso,* 472 F.Supp. 833 (E.D.N.Y.1979) (same with regard to county attorney).

## CONCLUSION

The Court finds that the individual defendants are absolutely immune from suit for their legislative actions, and that the actions complained of are essentially legislative in nature. Assuming for the argument that they are not, taking the facts alleged most favorably to plaintiffs, they do not come within the rule of *Branti* and *Elrod,* and therefore do not state claims upon which relief may be granted.

While the defendant Town of Clarkstown is not immune from suit, it is equally clear that based upon the uncontroverted facts of this case, plaintiffs have failed to establish a claim under 42 U.S.C. § 1983 against the Town itself.

By Memorandum and Order dated March 18, 1983 this Court reminded counsel that the age discrimination claim of plaintiff Maidman remains outstanding of record, although counsel agreed to submit a stipula-

tion dismissing that part of the action. Apparently Maidman does not wish to execute such a stipulation at this time, as appears from a letter to the Court being docketed and filed simultaneously herewith, dated March 22, 1983. Accordingly, that claim is severed and so much of the motion addressed to that claim or "cause of action," will be considered and disposed of separately by this Court.

As to all other claims the motion for summary judgment is granted in all respects. The Court declines at this time to make the finding contemplated by Rule 54(b), F.R.Civ.P.

So Ordered.