Andrew H. SIMS, Jr.

v.

CITY OF NEW LONDON, et al.

Civ. No. H–89–16(AHN).

United States District Court,
D. Connecticut.

May 31, 1990.

Susan G. Nelson, Copp, Berall, Wellette, Bates & Carta, Groton, Conn., for plaintiff.

Hyman Wilensky, Wilensky, Schwartz, and Hirsch, New London, Conn., Barbara J. Sheedy, Gillooly, McGrail, Carroll and Sheedy, New Haven, Stephen P. Fogerty, Joseph G. Lynch, Halloran & Sage, Hartford, Conn., for defendants.

## RULING ON MOTION FOR JUDGMENT ON THE PLEADINGS

NEVAS, District Judge.

Andrew Sims, former City Engineer of the City of New London, Connecticut (the "City"), brings this action pursuant to 42 U.S.C. Section 1983 against the City and the members of the City Council (the "Council") in their official capacities (count one). He has also brought suit against Council members Basilica, Massad, Nahas and Olsen in their individual capacities (count two). Sims claims that by publicly charging him with improprieties, and thereafter failing to hold an official hearing to investigate the veracity of those charges, the defendants have deprived him of a liberty interest in his reputation without affording him due process of law.

This matter is now before the court on defendants' motion for judgment on the pleadings pursuant to Rule 12(c), Fed.R. Civ.P. Defendants claim that they did not deprive Sims of due process by failing to hold a hearing. Alternatively, the Council members assert that they are immune from prosecution of this suit under one of two theories: (1) that the claims against the Council members in their official capacities are superfluous and therefore should be dismissed; and (2) that the claims against the Council members in their individual capacities are barred by the doctrine of legislative immunity. For the reasons discussed below, defendants' motion on the first count is granted with leave to amend. The motion on the second count is also granted.

### I. Background

Andrew Sims is a registered professional engineer, licensed to practice in the State of Connecticut. At all times relevant to this suit, Sims was employed as City Engineer by the City. Throughout his tenure Sims consistently received both annual salary increases and satisfactory performance appraisals. On or about July 14, 1988, however, Gregory Massad, a member of the Council, publicly called for Sims's resignation, charging him with acts of dishonesty and wrongdoing, and with unethical and unprofessional conduct in his performance as City Engineer. On July 15, 1988, an article appeared in The Day, a newspaper having general circulation in the Southeastern portion of Connecticut. The article, entitled *New London Councilor Calls for Sims's Resignation,* reported Massad's accusations and a list of the charges against Sims. Several similar articles soon followed.

As a result of these accusations, the Council voted to form a committee to investigate the charges, appointing Massad as its chair. Sims denied the charges and demanded that the matter be investigated and adjudicated by an impartial tribunal, one not chaired by Massad. The Council agreed, and on October 3, 1988 referred the matter to the American Arbitration Association. Nonetheless, on October 27, 1988, Sims tendered a letter of resignation to the City Manager, effective January 9, 1989. News of Sims's resignation also made the pages of The Day.

On November 7, 1988, Sims contacted the defendants demanding that the hearing go forward despite his resignation so that he might have the opportunity to answer the charges which had been publicly leveled against him. The Council refused, and on November 21, 1988 voted to terminate the arbitration proceeding. Consequently, Sims brought this suit alleging that the defendants' actions denied him of a liberty interest in his reputation without due process of law.

### II. Discussion

A. Standard of Review

Rule 12(c), Fed.R.Civ.P., provides:

After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable

opportunity to present all material made pertinent to such a motion by Rule 56. A Rule 12(c) motion may be granted "where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2nd Cir.1988). When passing on a motion for judgment on the pleadings, a court must accept as true all well-pleaded facts alleged in the complaint and refrain from dismissing the action unless the non-movant can prove no set of facts that would entitle itself to relief. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2nd Cir.1985).

### B. Analysis

Sims alleges that the defendants' actions created "a stigma ..., severely damaging [to] his good name, reputation, standing in the community, honor and integrity, both personally and professionally." Complaint para. 30. This stigma "severely damaged [his] business and professional relationships in the community, severely restricting [his] opportunities for future employment in the Southeastern Connecticut area." *Id.* para. 31. Sims further asserts that Massad, with reckless indifference to his rights, "commenced a publicity campaign against Plaintiff intended to result in the discontinuance of Plaintiff's employment with the City," *id.* para. 18, and, as a result, the Council failed to pay his customary annual salary increase as recommended by the City Manager. *Id.* para. 24.

Sims claims that denying him the opportunity to clear his name created the impression that his resignation was an admission of wrongdoing. He contends that by not holding the hearing, the City and the Council have deprived him of a liberty interest in his reputation without due process of law. Additionally, he claims that in their individual capacities certain members of the Council, by voting to terminate the hearing, likewise denied him due process of law.

### 1. *The Official Capacity Claims*

■ The defendants assert that claims against the Council members are essentially claims against the City. Because the City is also a defendant, they argue that the suits against the Council members in their official capacities are redundant and should be dismissed. The court disagrees.

■ Defendants do not claim, nor could they, that a suit against the City is barred by the doctrine of sovereign immunity. *Owen v. City of Independence*, 445 U.S. 622, 647–48, 100 S.Ct. 1398, 1413, 63 L.Ed.2d 673 (1980); *Monell v. Department of Social Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). The *Monell* Court held specifically that "local government officials sued in their official capacities are 'persons' under section 1983 in those cases which, as here, a local government would be suable in its own name." *Monell*, 436 U.S. at 690 n. 55, 98 S.Ct. at 2035 n. 55. Accordingly, official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Id.* Defendants apparently rely upon this language to assert that the suit against the Council members in their official capacities is superfluous. Such reliance is misplaced.

■ Municipal officials sued in their official capacities, like municipalities themselves, are not immune from suit. *See Owen*, 445 U.S. at 638 & n. 18, 100 S.Ct. at 1409 & n. 18 (holding that members of the city council in their official capacity are not immune from a section 1983 suit against the municipality for deprivation of liberty interest in reputation without due process); *Goldberg v. Whitman*, Civ. No. 88–840, slip op. at 6–7, —— F.Supp. ——, —— (D.Conn. Aug. 8, 1989) (Nevas, J.). Section 1983 abrogated whatever sovereign immunity previously existed for municipal entities. *See Owen*, 445 U.S. at 647–48, 100 S.Ct. at 1413. "The result is not different simply because the plaintiff has named municipal officials as defendants in their official capacities in lieu of—or in this case, in addition to—the municipal entity itself." *Goldberg*, at ——. Granted, "[t]here is no longer a need to bring official-capacity actions against local government officials, for under *Monell*, local government units can be sued directly for damages and injunctive

or declaratory relief." *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985) (citations omitted). But it is a nonsequitur that such suits *cannot* be brought. Indeed, the Supreme Court has implicitly held, after *Monell*, that plaintiffs may file suit against both a municipality and its agents in their official capacities. *See, e.g., Owen*, 445 U.S. at 638 n. 18, 100 S.Ct. at 1409 n. 18.[1] Moreover, the second circuit has held that if the municipal entity is not named, suits against local government actors in their official capacities are entirely proper when, as here, the plaintiff seeks injunctive relief. *Perez v. Ortiz*, 849 F.2d 793, 798 (2nd Cir.1988) (citing *Graham*, 473 U.S. at 167 n. 14, 105 S.Ct. at 3106 n. 14). *But see Rosa R. v. Connelly*, 889 F.2d 435, 437 (2nd Cir.1989) (claim against municipal officer sued in his official capacity properly dismissed absent allegation that he was directly and personally responsible for the purported unlawful conduct); *Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 886 (2nd Cir.1987) (same). The court finds, therefore, that the argument that a plaintiff may sue either a municipality or its agents but not both is without merit.

### 2. *The Individual Capacity Claims: Legislative Immunity*

The complaint also alleges that defendants Basilica, Massad, Nahas, and Olsen, by voting to terminate the hearing, deprived Sims of liberty without due process of law. Sims alleges that these defendants are therefore liable in their individual capacities and his prayers for relief seek monetary damages against each of them. Complaint paras. 34–35. The defendants respond that such a suit is barred by the doctrine of legislative immunity. The defendants' assertion raises two questions: (1) whether local legislators named in their individual capacities are immune from suit; and (2) if immunity is applicable, whether these four defendants acted in a legislative

capacity when they voted to terminate the hearing. Each question will be addressed in turn.

■ It is well settled that state legislators enjoy absolute immunity when engaged in "the sphere of legitimate legislative activity." *Tenney v. Brandhove*, 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951). In *Tenney*, the Court reviewed the common law tradition of legislative immunity and determined that Congress did not intend to abrogate that immunity by passage of the Civil Rights Act of 1871. *Id.* at 372–76, 71 S.Ct. at 786–88. The Court reasoned that:

> Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives. ... [T]hat it [is] not consonant with our scheme of government for a court to inquire into the motives of legislators [is] unquestioned.

*Id.* at 377, 71 S.Ct. at 788 (citation omitted). In construing the scope of state legislative immunity under Section 1983, courts have looked to the immunity accorded Congressmen under the constitution. *Supreme Court of Virginia v. Consumers Union*, 446 U.S. 719, 733, 100 S.Ct. 1967, 1975, 64 L.Ed.2d 641 (1980).

The Supreme Court later extended the doctrine of absolute legislative immunity to "regional legislators." *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 405, 99 S.Ct. 1171, 1179, 59 L.Ed.2d 401 (1979). There, the Court found that the reasoning of *Tenney* was "equally applicable to federal, state, and regional legislators." *Id.* (footnote

---

1. Some commentators have even intimated that there may be certain circumstances in which an official-capacity action *should* be brought against a local government official. *See* P. Bator, D. Meltzer, P. Mishkin, & D. Shapiro, *Hart*

*and Wechsler's The Federal Courts and The Federal System* 1250 n. 2 (3d ed. 1988). It should also be noted that Rule 25(d), Fed.R.Civ.P. and Rule 43(c)(1), Fed.R.App.P., both contemplate suits against officers in their "official capacity."

omitted). The Court expressly declined to reach the issue "[w]hether individuals performing legislative functions at the purely local level ... should be afforded absolute immunity." *Id.* at 404 n. 26, 99 S.Ct. at 1179 n. 26.

Since *Lake Country,* eight circuits have extended absolute legislative immunity to local legislators. *See Haskell v. Washington Township,* 864 F.2d 1266, 1277 (6th Cir.1988); *Aitchison v. Raffiani,* 708 F.2d 96, 98–100 (3rd Cir.1983); *Reed v. Village of Shorewood,* 704 F.2d 943, 952–53 (7th Cir.1983); *Espanola Way Corp. v. Meyerson,* 690 F.2d 827, 829–30 (11th Cir.1982), *cert. denied,* 460 U.S. 1039, 103 S.Ct. 1431, 75 L.Ed.2d 791 (1983); *Kuzinich v. County of Santa Clara,* 689 F.2d 1345, 1349–50 (9th Cir.1982); *Hernandez v. City of Lafayette,* 643 F.2d 1188, 1193–94 (5th Cir. 1981), *cert. denied,* 455 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982); *Bruce v. Riddle,* 631 F.2d 272, 279 (4th Cir.1980); *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607, 611–14 (8th Cir.1980); *see generally* M. Schwartz & J. Kirklin, *Section 1983 Litigation: Claims, Defenses & Fees,* 162 (1987) ("[a]ll post-*Lake Country Estates* circuit court decisions hold that since the nature of the function is controlling, local legislative officials are protected by absolute legislative immunity.") While the second circuit has yet to reach a decision on this issue, *see United States v. City of Yonkers,* 856 F.2d 444, 455–456 (2nd Cir. 1988), *rev'd on other grounds sub nom., Spallone v. United States,* — U.S. —, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990), at least five district courts in this circuit have held that local legislators are immune from suit for actions taken in their legislative capacity. *See Herbst v. Daukas,* 701 F.Supp. 964, 966–67 (D.Conn.1988) (Dorsey, J.); *Invisible Empire Knights of the Ku Klux Klan v. City of West Haven,* 600 F.Supp. 1427, 1431 n. 4 (D.Conn.1985) (Burns, J.); *Searingtown Corp. v. Inc. Village of North Hills,* 575 F.Supp. 1295, 1298 (E.D.N.Y.1981); *Dusanenko v. Maloney,* 560 F.Supp. 822, 826–27 (S.D.N.Y.1983),

*aff'd on other grounds,* 726 F.2d 82 (2nd Cir.1984); *Goldberg v. Village of Spring Valley,* 538 F.Supp. 646, 649 (S.D.N.Y. 1982).

The decisions of the various circuit courts and the district court opinions within this circuit are but realizations that the Court's reasoning in *Lake Country* "leaves little room to argue that municipal legislators stand on different footing than their regional counterparts." *Lake Country,* 440 U.S. at 407, 99 S.Ct. at 1180 (Marshall, J., dissenting in part).[2] The decisions cited above have taken Justice Marshall's recognition to heart. Regarding the "public good" rationale expressed in *Tenney,* these courts have perceived "no material distinction between the need for insulated legislative decision making at the state or regional level and a corresponding need at the municipal level." *Gorman Towers,* 626 F.2d at 612; *see also Aitchison,* 708 F.2d at 98–99; *Dusanenko,* 560 F.Supp. at 826. In fact, because municipal legislators are closer to their constituents, they are more vulnerable to litigation and its potential chilling effect on robust legislative debate. *Aitchison,* 708 F.2d at 98; *Gorman Towers,* 626 F.2d at 612. Moreover, when municipal legislators are elected (as in this case, *see* New London City Charter art. III, section 21), rather than appointed (as in *Lake Country* ), "the argument for immunity becomes stronger. The electoral process itself acts as a powerful restraint on improper legislative action." *Aitchison,* 708 F.2d at 98; *see also Tenney,* 341 U.S. at 378, 71 S.Ct. at 789; *Gorman Towers,* 626 F.2d at 613; *Herbst,* 701 F.Supp. at 966–67.

It is certainly true that the application of legislative immunity to municipal officials will limit the recourse of those aggrieved by unlawful legislative acts. But it is equally *untrue* that no judicial redress will therefore exist for such acts. The absence of immunity for municipalities, and their amenability to suits under *Monell* for monetary, declaratory, and injunctive relief

---

2. Indeed, at least one commentator has concluded that it is only a matter of time before the Supreme Court will confer absolute legislative immunity upon legislators at all governmental levels. S. Nahmod, *Civil Rights and Civil Liberties Litigation* 401 (2d ed. 1986).

when the alleged act is unconstitutional, "provides an additional check on unconstitutional acts of municipal legislators, as well as an effective remedy for wronged individuals." *Herbst*, 701 F.Supp. at 966–67; *see also Gorman Towers*, 626 F.2d at 613. Today's ruling simply ensures that municipal legislators, like their federal, state, and regional counterparts, will be able "to carry out their responsibilities as their consciences demand, free from the fear that political disagreements may result in legal actions" holding them personally liable. *Dusanenko*, 560 F.Supp. at 827.

■ Having found that absolute legislative immunity extends to local legislators, it is necessary to determine whether the Council defendants "were acting in the sphere of legitimate legislative activity," *Tenney*, 341 U.S. at 376, 71 S.Ct. at 788, when they terminated the investigation into Sims' alleged improprieties. Within this sphere, legislators are "protected not only from the consequences of litigation's results but also from the burden of defending themselves." *Dombrowski v. Eastland*, 387 U.S. 82, 85, 87 S.Ct. 1425, 1427, 18 L.Ed.2d 577 (1967); *see also Supreme Court of Virginia*, 446 U.S. at 732, 100 S.Ct. at 1974. The purpose of this immunity is to ensure both that legislators may carry out their function without fear of outside interference, *Supreme Court of Virginia*, 446 U.S. at 731, 100 S.Ct. at 1974, and that they are uninhibited in the discharge of their duty. *Tenney*, 341 U.S. at 377, 71 S.Ct. at 788.

In determining whether an official is protected by absolute immunity, the Supreme Court has adopted a functional approach: a court should "examine the nature of the functions with which a particular official or class of officials has been lawfully entrust-ed, and ... evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." *Forrester v. White*, 484 U.S. 219, 224, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988). Thus, the crucial inquiry concerns the capacity in which the Council defendants were acting when they voted to terminate the arbitration proceeding. *See Haskell*, 864 F.2d at 1277; *see also Supreme Court of Virginia*, 446 U.S. at 731, 100 S.Ct. at 1974.[3]

The Council itself, or any entity authorized by it, is empowered by the New London City Charter to "inquire into the conduct of any department or office of the city and to make investigations as to the city affairs." City Charter art. VI, section 47. Certainly, "[i]nvestigations ... are an established part of representative government," and it " 'is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees.' " *Tenney*, 341 U.S. at 377 & n. 6, 71 S.Ct. at 789 & n. 6 (quoting W. Wilson, *Congressional Government* 303 (1885)). In the instant case, the Council fulfilled its function. It began an investigation into the propriety of the actions of an important town official—an investigation it was obligated to undertake. The Council suspected Sims of committing acts of dishonesty and wrongdoing, and of unethical and unprofessional conduct in his performance as City Engineer. These improprieties, if true, are quite serious. The Council had a right to investigate these matters, an inquiry that "may fairly be deemed within its province." *Tenney*, 341 U.S. at 378, 71 S.Ct. at 789. This is clearly not a case where the Council has exceeded the bounds of its legislative power and usurped "functions exclusively vested in the Judiciary or the Executive." *Id.*[4]

---

3. Although their reasoning may be helpful, cases such as *Herbst, Rateree v. Rockett*, 630 F.Supp. 763 (N.D.Ill.1986), *aff'd*, 852 F.2d 946 (7th Cir.1988), and *Healy v. Town of Pembroke Park*, 643 F.Supp. 1208 (S.D.Fla.1986), *aff'd in part and rev'd in part*, 831 F.2d 989 (11th Cir. 1987) are actually inapposite because they concerned whether a particular vote of a town council constituted the dismissal of a municipal employee. Such is not the case here, since the gravamen of the second count is that the Council members' "vote to terminate the arbitration proceeding ... intentionally or recklessly deprived the Plaintiff of liberty without due process of law." Complaint para. 35.

4. Indeed, because the New London City Charter vests both legislative *and* executive power in the City Council (Charter Section 21) the Council

To subject the Council members to suit or threat of suit would severely inhibit their willingness to fulfill one of their primary duties—to investigate improper activity that may be harmful to the City. Moreover, allegations concerning the motives of the Council in beginning the investigation are irrelevant. As the Supreme Court has noted, "[i]n times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies." *Id.*

Since it was within the legislative power of the Council to begin the above-described investigation, it was necessarily within that power to end it. This case is simply an illustration of the generally accepted proposition that a legislature's greater power necessarily includes a lesser one. *See, e.g., Posados de Puerto Rico Assocs. v. Tourism Co.,* 478 U.S. 328, 345–46, 106 S.Ct. 2968, 2979, 92 L.Ed.2d 266 (1986). For the reasons elaborated above, the Council's motives for terminating the investigation are also irrelevant. Therefore, the votes of Council members Basilica, Massad, Nahas, and Olsen to terminate the hearing were in furtherance of their legislative function. As such they are shielded from suit by the doctrine of legislative immunity.

### 3. *Deprivation of a Liberty Interest Without Due Process*

The next issued raised by the defendants' motion is whether Sims' complaint states a claim for deprivation of a liberty interest. For the reasons stated below, the court finds that it does not but grants Sims leave to amend the complaint to address its deficiencies.

It is now well-settled that discharge from public employment under circumstances that put an employee's reputation, honor or integrity at stake gives rise to a liberty interest under the Due Process Clause of the fourteenth amendment. *See Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct.

2074, 2079, 48 L.Ed.2d 684 (1976); *Paul v. Davis,* 424 U.S. 693, 710, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976); *Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972); *see also Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971) ("[w]here a person's good name, honor or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.") The process due such an individual is a hearing which provides a public forum or opportunity to clear his name, not actual review of the decision to terminate his employment. *Roth,* 408 U.S. at 573 n. 12, 92 S.Ct. at 2707 n. 12. Recently, the fifth circuit succinctly elaborated the necessary elements of a cause of action for such a denial of due process. The plaintiff must prove:

> that he was discharged, that defamatory charges were made against him in connection with the discharge, that the charges were false, that no meaningful public hearing was conducted pre-discharge, that the charges were made public, that he requested a hearing in which to clear his name, and that the request was denied.

*Rosenstein v. City of Dallas,* 876 F.2d 392, 395–96 (5th Cir.) (footnotes omitted), *reh'g granted,* 884 F.2d 174 (1989).

The element at issue in this case is whether Sims was "discharged" in any meaningful sense of the word. Mere damage to one's reputation, without implicating a more tangible interest such as employment, is insufficient to invoke the procedural protection of the Due Process Clause. *Paul,* 424 U.S. at 701, 96 S.Ct. at 1160. To establish a claim under section 1983 and the fourteenth amendment, there must be something more than a mere defamation by a government official. *Paul,* 424 U.S. at 710, 96 S.Ct. at 1164.[5] Additionally, the defamation must occur "in the course of

---

could not usurp executive power vested in another body or officer.

**5.** To require less "would make of the Fourteenth Amendment a font of tort law," *Paul,* 424 U.S. at 701, 96 S.Ct. at 1160; and would turn every

state-law tort violation committed by a government official into a constitutional violation. *Id.* at 699, 96 S.Ct. at 1159; *Neu v. Corcoran,* 869 F.2d 662, 666 (2nd Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989).

the termination of employment." *Paul*, 424 U.S. at 711, 96 S.Ct. at 1165; *Roth*, 408 U.S. at 573, 92 S.Ct. at 2707. In the words of the second circuit:

> *Paul* thus strongly suggests that defamation, even if it leads to a significant loss of employment opportunities, is not a deprivation of a liberty interest unless it occurs in the course of dismissal or refusal to rehire the individual as a government employee or during termination or alteration of some other legal right or status.

*Neu v. Corcoran*, 869 F.2d 662, 667 (2nd Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989). Phrased differently, *Paul* requires a showing of "stigma plus," *id.*, but the case law is not altogether clear just what the "plus" requires.[6]

**6.** The second circuit in *Neu* also suggested that *Paul*:

> might plausibly be interpreted as holding that any governmental defamation that causes a person to lose his job and impairs his ability to pursue his chosen profession or occupation is enough to constitute a deprivation of liberty, even if it does not occur in the course of dismissal from government employment or alteration of some other right or status recognized by state law. The "plus," in other words, might simply be that a consequence of the defamation was deprivation of the right ... "to engage in any of the common occupations of life."

*Neu*, 869 F.2d at 667 (citation omitted). *Neu*, however, concerned whether qualified immunity shielded state officials who defamed a private citizen and thereby damaged his career opportunities. Qualified, or good faith, immunity shields officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The official is only liable if the contours of the right he is alleged to have violated are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Thus, the discussion of *Paul* in *Neu* focused on whether the due process right against defamation had been clearly established in this circuit. The "plausible" readings it describes are simply alternative formulations that a reasonable defendant might have come to. Such readings, necessarily speculative, do not rise to the level of holdings. Moreover, *Neu* involved application of *Paul* to a civilian and his profession, a point on which *Paul* is even more unclear. In the instant case, these factors are not

Yet *Paul* suggests, and cases in this circuit seemingly agree, that the "plus" must consist of at least some form of dismissal from employment or deprivation of some other legal right or status. *See, e.g., Walentas v. Lipper*, 862 F.2d 414, 420 (2nd Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1747, 104 L.Ed.2d 183 (1989); *Brandt v. Board of Coop. Educ. Servs.*, 820 F.2d 41, 45 (2nd Cir.1987); *Gentile v. Wallen*, 562 F.2d 193, 197–98 (2nd Cir.1977); *Huntley v. Community School Bd.*, 543 F.2d 979, 985–86 (2nd Cir.1976), *cert. denied*, 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 773 (1977).

 Here, Sims admits that he was not discharged, but rather that he resigned to seek other employment. Complaint para. 25.[7] The court finds that this admission,

present. The court finds persuasive case law suggesting that the holding in *Paul*, as it pertains to government employees, requires that the defamation occur during the course of termination.

**7.** Relying on *Stewart v. Bailey*, 556 F.2d 281 (5th Cir.1977), the defendants argue that the plaintiff waived his right to a hearing by voluntarily resigning. The *Stewart* court held that "Stewart knowingly and intelligently chose to waive his right to a hearing in order to improve the possibility of obtaining other employment." *Id.* at 286. But this does not mean that *any* resignation waives a constitutional right to a hearing, and the fifth circuit itself has so interpreted *Stewart*. *See Bueno v. City of Donna*, 714 F.2d 484, 492 (5th Cir.1983) (*Stewart* "makes clear that resignation alone does not automatically constitute waiver of due process safeguards").

The standard for measuring an effective waiver of a constitutional right requires that the waiver be an "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). In evaluating claims of waiver courts have indulged every reasonable presumption against finding relinquishment of a right. *Parham v. Cortese*, 407 U.S. 67, 95, 92 S.Ct. 1983, 2001, 32 L.Ed.2d 556 (1972). Here, the Council's decision to terminate the hearing was made after Sims had informed the Council that he wished to continue with the hearing notwithstanding his resignation. Complaint paras. 25–27. On the facts of this case, the court finds that Sims's resignation does not meet the demanding standards of *Johnson* and *Parham*.

Moreover, as will be discussed below, the voluntariness of Sims's resignation would be directly challenged by any constructive discharge claim. To find that resignation *per se* consti-

coupled with the absence of other facts suggesting that the stigmatizing remarks were made in the course of termination, renders plaintiff's complaint inadequate to survive a motion for judgment on the pleadings. However, the defendants seemingly concede,[8] and the court finds, that an adequate allegation that the plaintiff was constructively discharged would satisfy the requirement of termination.[9] *Cf. Pena v. Brattleboro Retreat*, 702 F.2d 322, 324–26 (2nd Cir.1983) (constructive discharge satisfies termination element in Title VII action).

A constructive discharge occurs when an employer, rather than actually terminating an employee, " 'deliberately makes [that] employee's working conditions so intolerable that the employee is forced into an involuntary resignation.' " *Id.* at 325 (quoting *Young v. Southwestern Savings and Loan Assn.*, 509 F.2d 140, 144 (5th Cir.1975)); *see also Martin v. Citibank, N.A.*, 762 F.2d 212, 221 (2nd Cir.1985). To plead a prima facie case of constructive discharge a plaintiff must allege two elements. First, the plaintiff must show that the defendants acted deliberately to create an intolerable work environment. " 'Deliberateness exists only if the actions complained of were intended by the employer as an effort to force the employee to quit.' " *Lombardo v. Oppenheimer*, 701 F.Supp. 29, 30 (D.Conn.1987) (Dorsey, J.) (quoting *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986)).

The second and more nebulous element requires that the working conditions be "intolerable." Intolerability is measured by an objective standard, not the employee's subjective opinion. *Id.* 701 F.Supp. at 30–31. Thus, a plaintiff must allege facts sufficient to permit the conclusion that the working conditions were "so difficult or unpleasant that a reasonable person in the

employee's shoes would have felt compelled to resign." *Pena*, 702 F.2d at 325 (citation omitted); *see also Martin*, 762 F.2d at 221. As the cases illustrate, this standard is indeed a demanding one. *See, e.g., Martin*, 762 F.2d at 221 (resignation due to humiliation from supervisor's loud mention of a polygraph test and over burdensome work conditions does not amount to constructive discharge); *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 888–89 (3rd Cir.1984) (constructive discharge found where plaintiff was verbally abused, threatened, and forcibly transferred to a position with substantially lower salary and inferior working conditions); *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 371–72 (5th Cir.1981) (constructive discharge found where pregnant employee involuntarily transferred to heavy manual labor that posed substantial health risks to her and her child); *Young*, 509 F.2d at 143–44 (constructive discharge found where plaintiff, an atheist, was forced to attend prayer meetings as part of her job); *Lombardo*, 701 F.Supp. at 31–33 (transfer to a monotonous and demeaning job with less responsibilities and cold treatment from superiors is insufficient to support a claim of constructive discharge); *Neale v. Dillon*, 534 F.Supp. 1381, 1390–91 (E.D.N.Y.), *aff'd*, 714 F.2d 116 (2nd Cir.1982) (no constructive discharge found where plaintiff was denied a promotion, deprived of her office, and her possessions were placed in a shopping cart in the hall).

Under these criteria, the complaint as it is now pleaded does not state a claim for constructive discharge.

### Conclusion

For the foregoing reasons, the defendants' Rule 12(c) motion as to the first count is granted with leave to amend the complaint consistent with this opinion. The defendants' motion as to the second count

tutes a waiver would effectively preclude assertion of a claim for constructive discharge.

**8.** Memorandum of Law in Support of the Defendants' Motion for Judgment on the Pleadings Dec. 5, 1989, p. 5 ("As the pleadings make very

clear, Sims resigned; he was neither fired nor constructively discharged.")

**9.** That such a pleading maneuver is proper was accepted *arguendo* in *Carfora v. City of New York*, 705 F.Supp. 1007, 1009–10 (S.D.N.Y.1989).

is also granted. Plaintiff's amended complaint shall be filed no later than twenty-one (21) days from the date of this ruling.

SO ORDERED.