■ MICHAEL FIORENZA, Petitioner, v DAVID GUNN et al., Respondents

Adjudged that the petition is granted, on the law, with costs, to the extent that so much of the respondents' determination as sustained the charge that petitioner refused to submit to a fitness for duty test after being so ordered by a supervisor is annulled, the penalty of dismissal is vacated, and the respondent New York City Transit Authority is directed to reinstate the petitioner to his position as car maintainer, the petition is otherwise denied, so much of the determination as sustained the charge that the petitioner, while on duty, was away from his work location without authorization is confirmed, and the matter is remitted to the respondent New York City Transit Authority for a determination of an appropriate penalty to be imposed for that violation which shall not include dismissal, and for a calculation of any back pay due and owing to the petitioner.

The petitioner was an employee of respondent New York City Transit Authority (hereinafter the Authority), having received a permanent civil service appointment to the title car maintainer "E" in May 1981. He was assigned to the Car Equipment Department. On July 15, 1985, the Authority preferred formal disciplinary charges of misconduct and/or incompetence against the petitioner, pursuant to Civil Service Law § 75. Specifically, the charges alleged that (1) on June 14, 1985, the petitioner, while on duty, was away from his work

location without authorization and (2) on June 14, 1985, the petitioner refused to submit to a fitness for duty test after being so ordered by a supervisor. After an evidentiary hearing which was conducted on August 2, 1985, the Hearing Officer sustained the charges and recommended that the petitioner be dismissed from service pursuant to the Authority's policy regarding refusal to submit to a fitness for duty test. The Hearing Officer's findings and recommendation were approved by the Authority and the petitioner was dismissed, effective October 16, 1985. Subsequently, the petitioner commenced the instant proceeding to review the Authority's determination on the ground the record did not contain substantial evidence to support the charges. Additionally, the petitioner contended that his supervisor's directive to submit to blood and urine tests was violative of his constitutional right against unreasonable searches and seizures, because the directive was not predicated upon reasonable suspicion that he had been consuming alcoholic beverages or ingesting drugs.

Regarding the petitioner's latter contention, the respondents argue that the constitutional objection is not available in this judicial proceeding to attack the Authority's determination due to the petitioner's failure to raise this objection at the administrative level. It is well settled that the exhaustion of administrative remedies is not required where an agency's action is challenged as unconstitutional, subject to the following qualification. If the constitutional claim hinges upon factual issues reviewable at the administrative level, the claim must first be addressed to the agency so that a necessary factual record can be established (see, Matter of Dozier v New York City, 130 AD2d 128, 134-135; Matter of Celestial Food Corp. v New York State Liq. Auth., 99 AD2d 25, 27, n). A review of the administrative record discloses that the petitioner had, according to one of the Authority's witnesses, initially refused to submit to a blood or urine test, citing his civil rights, and the Hearing Officer permitted the Authority to proffer evidence regarding the factual background and basis for directing the petitioner to submit to a fitness for duty test. In view of the adequate record developed at the administrative level, a review of the petitioner's constitutional claim is not precluded. The following facts were adduced at the hearing:

On June 14, 1985, the petitioner was on the 4:00 P.M. to midnight shift. He was also the plant electrician for the Coney Island Main Shop during that shift. His title as electrician authorized him to work in different locations of the shop as

repairs were needed. He was also authorized to leave his work station to attend a comfort station. His coffee break was 6:00 to 6:15 P.M. and his lunch break was 8:00 to 8:30 P.M. The petitioner was not entitled to a work break between 10:00 and 10:30 P.M. Line Supervisor Katranakis testified that petitioner had no duties in the "grid area" on that date. The grid area is a construction area in the plant where employees assemble frames for subway cars.

In the course of an investigation on June 14, 1985, of the grid area as a location where employees were congregating during working hours for the purpose of drinking and using drugs, Acting Department Superintendent Gagliano stationed himself on the rooftop to observe the grid area through an open skylight. Gagliano testified that at 10:00 P.M., from this rooftop perch, he observed in the grid area the petitioner and three other employees. He observed the petitioner in the grid area for approximately 30 minutes, from 10:00 to 10:30 P.M., "just * * * sitting" on a box, doing no work. The petitioner was about 30 feet from the men's room. At about 10:30 P.M., Gagliano gave a signal by radio for two line supervisors (Katranakis and Nazari) to confront and detain any employee found in the grid area.

Line Supervisor Katranakis testified that upon entering the grid area, he first heard a loud noise as if somebody had closed a tool locker. When the men saw him, they went in different directions. He asked the petitioner what he was doing in the grid area and the petitioner responded that he had stopped there about five minutes ago to see a friend. Katranakis did not observe any of the men drinking. Katranakis cut open the bolt of a tool locker and found a paper bag inside the locker, containing an almost empty bottle of vodka. He did not know the identity of the owner of this locker. During a search of other lockers and cabinets in the immediate vicinity, Gagliano found a box containing a white powdered substance, a three-inch razor blade and a plastic tube.

The employees detained in the grid area by the line supervisors were transported to a hospital and directed to submit to a blood test. According to Katranakis, the petitioner refused to take a blood test, citing "my civil rights * * * my civil service rights". The employees, including the petitioner, who declined to take a blood test were transported to a clinic and directed to take a urine test. The petitioner again refused, citing his civil service rights, and denied that he had been drinking.

At the evidentiary hearing, the petitioner testified that at 10:15 P.M., he had been away from his work station because he

had gone to the men's room to relieve himself. He claimed that the men's room was approximately 15 feet from the grid area. After leaving the men's room, he conversed for about five minutes with another foreman and employee in an area outside the grid area. No longer than two minutes after the foreman left, another foreman "came jumping across the roof" and "grabbed [his] arm". The petitioner did not attempt to walk or run away. He testified that he refused to take blood and urine tests because, *inter alia,* he feared that his employer would discover that he was an epileptic and discharge him. The petitioner submitted a letter from his doctor, corroborating his allegation that he suffered from epileptic seizures and, at the time of the incident, was taking medication (Dilantin) to control his seizures. The petitioner admitted that he had lied at a prior Step Two Disciplinary Hearing, held on June 17, 1985, when he stated, orally and in writing, that prior to coming to work on June 14, 1985, he had attended a graduation party where he had consumed vodka and orange juice, but not to excess. He maintained that he had lied on June 17, 1985, at the behest of his union representative, and maintained that on June 14, 1985, he had not been drinking prior to the commencement of his shift.

The Authority's rule 11 provides, in part: "Employees [in titles in Groups I and II of the Rapid Transit Railroad Service Classifications] must not drink alcoholic beverages of any nature during their tours of duty; nor may they drink such beverages at any time to an extent making them unfit to report for duty or to be on duty * * * Alcoholic breath, incoherent speech or staggering is prima facie evidence of being in an unfit condition. Employees suspected of drinking alcoholic beverages before or during their tours of duty must be directed to submit to a blood alcohol examination, whether or not they admit such indulgence. Failure by an employee to submit to such examination shall subject him to immediate suspension and disciplinary action". The rules further prohibit employees to use or have in their possession controlled substances or paraphernalia used to administer such controlled substances, except with the written permission of the medical director-chief surgeon of the system (rule 11 [b]).

Compelling employees in titles in Groups I and II of the Rapid Transit Railroad Service Classifications, such as the petitioner, to submit to a blood or urine test for the purpose of detecting the use of alcohol or drugs violates the proscription against unreasonable searches and seizures contained in both the State and Federal Constitutions (US Const 4th Amend; NY

Const, art I, § 12), unless it is predicated upon reasonable suspicion with respect to a particular employee *(see, Matter of Patchogue-Medford Congress of Teachers v Board of Educ.,* 70 NY2d 57; *Matter of Dozier v New York City,* 130 AD2d 128, *supra).* In accordance with an employee's constitutional rights, we construe the rule as requiring, as a prerequisite, reasonable individualized suspicion, before an employee may be directed to submit to a blood or urine test for the purpose of drug or alcohol detection.

Upon a review of the instant record, there is no substantial evidence to support a finding that the directive issued to the petitioner to submit to a blood or urine test for the purpose of detecting the use of alcohol and drugs and, thus, his fitness for duty, was predicated upon reasonable suspicion. None of the witnesses for the Authority observed the petitioner drinking alcoholic beverages or taking drugs. According to Gagliano, who had the petitioner under observation for approximately 30 minutes, the petitioner was merely sitting on a box in the grid area, an area of the plant where unidentified employees were reportedly meeting during work hours to drink and take drugs. We note the latter testimony regarding the use of the grid area by employees for drug and alcohol consumption was erroneously stricken by the Hearing Referee as hearsay. Hearsay is admissible on the issue of whether the directive to submit to blood or urine tests, a search and seizure, was predicated upon reasonable suspicion *(see, People v Loria,* 10 NY2d 368, 374, *rearg denied* 12 NY2d 1022; *People v Landy,* 59 NY2d 369; *Veras v Truth Verification Corp.,* 87 AD2d 381, 386, *affd* 57 NY2d 947; *People v Restrepo,* 87 AD2d 320, 323; *People v Prisco,* 61 Misc 2d 730, 733). The petitioner's mere presence in an area allegedly used by employees for alcohol and drug consumption does not suffice to establish a reasonable suspicion that the petitioner had consumed alcohol or drugs *(cf., Matter of King v McMickens,* 69 NY2d 840, *rearg denied* 69 NY2d 985). Nor was there any evidence linking the petitioner with the lockers in the grid area, which were found to contain a bottle of vodka and a white powdered substance. Moreover, there is nothing in Katranakis's testimony to infer that the noise he heard upon entering the grid area emanated from the tool locker containing the bottle of vodka. There is no evidence that the petitioner had been involved in an accident or had exhibited any indicia of drug or alcohol consumption, such as bloodshot eyes, alcoholic breath, incoherent speech or staggering *(cf., Matter of Krolick v Lowery,* 32 AD2d 317, *affd* 26 NY2d 723, *cert denied sub nom. Vyse v*

*Lowery,* 397 US 1075). Under the circumstances of this case, the directive issued to the petitioner to submit to a blood or urine test was not predicated upon reasonable suspicion. Consequently, the petitioner's failure to comply with a directive violative of his constitutional rights may not be relied upon by the Authority as a ground for disciplinary action.

Regarding the charge that the petitioner, while on duty, was away from his work station without authorization, we conclude that the record contains substantial evidence to sustain this charge, which essentially turned on an issue of credibility.

Lastly, the penalty of dismissal, which was imposed because of the Authority's policy concerning refusals by employees to submit to a fitness for duty test, is hereby set aside. Moreover, the imposition of such a sanction upon the petitioner, whose four-year service record is blemished by only one official caution, and the charge of being away from his work station without authorization for approximately 30 minutes, would be " ' "so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness" ' " *(Matter of Pell v Board of Educ.,* 34 NY2d 222, 233). Accordingly, the matter is remitted to the Authority for the fixing of an appropriate sanction. Bracken, J. P., Rubin and Kooper, JJ, concur.

Weinstein, J., concurs in part and dissents in part and votes to confirm the determination under review and dismiss the petition on the merits, with the following memorandum, in which Kunzeman, J., concurs. Having found that (1) under the circumstances, there was substantial evidence on record upon which to conclude that the New York City Transit Authority (hereinafter the Authority) had a reasonable suspicion to demand that the petitioner submit to blood and urine tests, (2) the charges preferred against him after his refusals to submit to those tests were sustained by substantial evidence, and (3) the penalty imposed was not so disproportionate to the offense as to be shocking to one's sense of fairness *(see, Matter of Pell v Board of Educ.,* 34 NY2d 222, 223), I vote to confirm the determination of the Authority. My conclusion is strengthened by the following dictum of the Court of Appeals in the recently decided case of *Matter of Matt v Larocca* (71 NY2d 154, 160): "Public employees, charged with a public trust, do not have an absolute right to refuse to account for their official actions and at the same time retain their employment". Notwithstanding the factual disparities between the instant case and *Matter of Matt v Larocca (supra),* which

involved the refusal of a public employee, who was also the target of a criminal investigation, to answer questions relating to the performance of his official duties, the cited language is nevertheless illustrative inasmuch as it expresses a general statement of policy.

Of particular significance are the petitioner's varying explanations for his conduct on June 14, 1985. At a Step Two Disciplinary Hearing conducted three days after the incident, the petitioner revealed that he had refused to submit to a blood alcohol test due to his fear of needle injections and communicable diseases which he had learned of from the communications media. His refusal to submit to urinalysis was predicated upon his fear that his employer would thereby detect his epilepsy. The petitioner had also indicated that, prior to arriving at work on June 14, 1985, he had attended a graduation party at which he had consumed vodka and orange juice. The subject statements were reduced to writing. At the August 2, 1985, evidentiary hearing, however, the petitioner testified that he had lied at the earlier hearing with respect to his having imbibed alcohol at a graduation party on the date of the incident. He claimed to have fabricated that story upon the advice of a union representative. The petitioner testified that he was not in fact drinking or under the influence of any drugs on June 14, 1985.

It bears further noting that at the August 2, 1985, hearing, the petitioner proffered a further excuse for his having been present in the subject area at the time in issue. In his capacity as chief electrician for the Coney Island Main Shop, the petitioner had decided to check the designated location to ascertain whether the row of approximately 100 fluorescent lights located there was operative.

The record contains testimony of supervisory personnel with respect to the sound of a tool locker being closed at the approach of the confronting supervisors. Of further significance are the contents of two lockers, which were in close proximity to where the petitioner had been observed loitering outside his customary work station for approximately one-half hour. These were found to contain a nearly empty bottle of vodka and a white powdered substance along with a razor blade and a plastic tube. Under the circumstances, I cannot escape the rational conclusion that the Authority's demand that the petitioner submit to blood and urine testing was predicated upon reasonable suspicion. It cannot be gainsaid that probable cause is not required where the request to submit to testing is not aimed at the discovery of evidence for

use in a criminal trial *(see, Matter of King v McMickens,* 120 AD2d 351, 353, *affd* 69 NY2d 840, *rearg denied* 69 NY2d 985). Moreover, the petitioner's inconsistent utterances seriously impugned his credibility, while his highly responsible position involving the safety and maintenance of a public transportation network precludes interference with the discipline imposed. Inasmuch as the Authority's determination was supported by " 'such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact' " *(Matter of King v McMickens, supra,* at 353, quoting from *300 Gramatan Ave. Assocs. v State Div. of Human Rights,* 45 NY2d 176, 180), that determination, which had a rational basis, should be confirmed and the petition dismissed.

I concur with my colleagues of the majority only to the extent that they have held that the charge that the petitioner, while on duty, was away from his work station without authorization was supported by substantial evidence.