Michael NOCERA, Plaintiff,

v.

NEW YORK CITY FIRE COMMISSION-ER, Carlos Rivera, Anthony Fusco, Chief of Department, New York City Fire Department, Richard Saccamano, Defendants.

No. 94 Civ. 1624 (JGK).

United States District Court,
S.D. New York.

March 31, 1996.

Rosemary Carroll, Kliegerman & Friess, New York City, for plaintiff.

Paul J. Crotty by Mari J. Bebon, Corporation Counsel of City of New York, New York City, for defendants.

OPINION AND ORDER

KOELTL, District Judge:

The plaintiff, Michael Nocera ("Nocera"), brings this action against the defendants Carlos Rivera, New York City Fire Commissioner; Anthony Fusco, Chief of the New York City Fire Department; Richard Saccamano; and the New York City Fire Department ("Rivera," "Fusco," "Saccamano," and the "Department" or collectively as "defendants") alleging violations of his rights under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution while employed as a probationary fire fighter by the New York City Fire Department. The plaintiff alleges that the defendants violated his constitutional rights by requiring a urinalysis drug test and thereafter by discharging him after a positive test result. The defendants argue, among

other things, that they had a reasonable basis for requiring the test in the plaintiff's case and that the individual defendants are protected by qualified immunity.

■ In his complaint, the plaintiff asserted three claims for relief. The first claim alleged that the drug test violated the plaintiff's Fourth and Fourteenth Amendment rights. The second claim alleged a violation of the plaintiff's property interest under the Fourteenth Amendment because of the defendants' alleged refusal to afford the plaintiff the right to retest the results of the drug test on which his termination was allegedly based. The third claim for relief, also asserted under the Fourteenth Amendment, alleged that the plaintiff's liberty interest was violated because of the stigmatizing information contained in the Department files as to which the plaintiff was allegedly afforded no opportunity to be heard. The parties have stipulated that the plaintiff's second claim alleging that he was deprived of a property interest is withdrawn. The defendants move for summary judgment dismissing the remaining two claims. The plaintiff seeks summary judgment finding that the allegedly compulsory urinalysis drug test violated his Fourth and Fourteenth Amendment rights because the Fire Department did not have a sufficient basis to require the test.[1]

## I.

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs. Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried,

not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo*, 22 F.3d at 1224.

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *see also Gallo*, 22 F.3d at 1223.

If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). With respect to the issues on which summary judgment is sought, if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

When, as in this case, both parties seek summary judgment, the Court must " 'evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.' " *Abrams v. United States*, 797 F.2d 100, 103 (2d Cir. 1986) (quoting *Schwabenbauer v. Board of Educ.*, 667 F.2d 305, 314 (2d Cir.1981)).

---

1. In his complaint, the plaintiff also referred to the New York State Constitution although none of his claims is specifically grounded in the New York State Constitution. In any event, the standards for the claims under the New York State Constitution are no different from the standards applied to his claims under the United States Constitution. *See Burka v. New York City Transit Auth.*, 739 F.Supp. 814, 832–33 (S.D.N.Y.1990) (Patterson, J.).

Only where one of the parties is entitled to judgment as a matter of law upon material facts not genuinely in dispute is the Court warranted in granting summary judgment.

## II.

There is no genuine dispute with respect to the following facts established in the record.

The plaintiff Michael Nocera ("Nocera") was appointed a probationary fire fighter with the New York City Fire Department ("Fire Department" or "Department") on May 9, 1993.

As a condition to his appointment as a probationary fire fighter, the plaintiff underwent a full medical examination on July 24, 1991. Since over one year had elapsed, the plaintiff was scheduled for another full medical examination on September 16, 1992 as a condition to appointment; he cancelled his appointment for the examination. (Defs.' Ex. 3.)[2] The plaintiff cancelled additional appointments on September 21, 1992 and November 19, 1992. On or about February 5, 1993, the plaintiff was informed by the Department that he could no longer postpone his medical examination and that he would have to appear on February 18, 1993. (Defs.' Ex. 3; Pl.'s Dep. Tr., dated September 23, 1994 at 60, annexed as Defs.' Ex. 5.) On February 18, 1993, the plaintiff finally appeared for his preappointment medical exam and was medically qualified for appointment to the position of probationary fire fighter. (Defs.' Ex. 3.)

The plaintiff, who was then 27 years old, was appointed as a probationary fire fighter on May 9, 1993. (Def. Ex. 7.) Upon his appointment, the plaintiff was assigned to the Fire Department, Division of Training ("Training Academy"). (*Id.*) While assigned to the Training Academy, the plaintiff participated in probationary orientation. On their first day at the Training Academy, all probationers are given a five-page document entitled "Orientation for Probies" ("handout"). (Defs.' Ex. 8; Dep. Tr. of Richard Saccomanno, dated June 23, 1994, annexed as Defs.' Ex. 9 at 3–4.) The instructors at the Acade-

my go through this document line by line with the probationers. (*Id.*) This handout explicitly states: "Any notices received which might be of interest to the Fire Department must be delivered to the P.F.S. [Probationary Fire fighter School] office as soon as possible. Such notices might include but are not limited to: military orders, subpoenas, jury notice, court appearances." (Defs.' Ex. 8 at 4.) The handout also states: "Trainees are responsible for compliance with the Rules and Regulations for the Uniformed Force of the Fire Department and all amendments and revisions that are promulgated." (*Id.* at 5.)

Rule 25.4.2 of the Rules and Regulations for the Uniformed Force of the Fire Department ("Rules and Regulations") provides that:

Members shall not engage in an altercation, commit assault or violate any law.

*When members are arrested, or issued a desk appearance ticket, they shall without delay notify the officer on duty of their assigned unit.* Such notification shall include the nature of the charges, date, time, and location of occurrence.

(Defs.' Ex. 10 (emphasis added).)

Rule 25.1.6 of the Rules and Regulations provides that "members shall not, at any time, indulge in or be under the influence of marihuana or any controlled substance prohibited by the New York State Penal Law." (Defs.' Ex. 11.)

On Friday, May 21, 1993, nine business days after his probationary appointment, the plaintiff reported sick and did not report to the Training Academy. (Defs.' Ex. 13.) The plaintiff again reported sick on Friday, June 18, 1993 and did not report to the Training Academy. (Def. Ex. 14.) On Tuesday, June 22, 1993, the plaintiff was continued on Medical Leave with an expected return to full duty assignment at the Training Academy on Friday, June 25, 1993. (Defs.' Ex. 15.)

On Friday, June 11, 1993, the plaintiff was arrested for criminal trespass in the third

---

**2.** All references to "Defs.' Ex." refer to exhibits to Defendants' Revised Rule 3(g) Statement dated June 9, 1995.

degree and acknowledged receipt of a Desk Appearance Ticket, which stated that criminal charges were pending against him. (Defs.' Ex. 15, 16, 18.) The plaintiff did not then report his arrest to the Fire Department although he was required to do so pursuant to instructions given in training and pursuant to Rule 25.4.2 of the Rules and Regulations. (Defs.' Ex. 5 at 130; Defs.' Ex. 10.)

On or about Tuesday, June 29, 1993, the State of New York, Division of Criminal Justice Services notified the Fire Department of the plaintiff's arrest. (Defs.' Ex. 16, 20.) The plaintiff's arrest report was forwarded to the Division of Trials and Investigations of the Fire Department on June 29, 1993. (Defs.' Ex. 16, 17.) The arrest report received by the Fire Department states that on Friday, June 11, 1993 at 1850 hours the plaintiff was observed in the lobby of 30 Avenue V, a building in the Marlboro Projects, and was arrested for criminal trespass in the third degree. (*Id.*) The arrest report further states that the lobby where the plaintiff was observed is a "known drug location," that the plaintiff did not live in the building, that the plaintiff had no valid reason for being there, and that "No trespass" signs were visibly posted. (*Id.*)

On Tuesday, June 29, 1993, the defendant Richard Saccomanno, Battalion Chief of the Probationary School, was informed by Margie Prather of the Fire Department's Candidate Investigation Unit ("CIU") that the plaintiff was arrested on June 11, 1993 and he had failed to report his arrest. (Defs.' Ex. 21.) Defendant Saccomanno was instructed to obtain a statement from the plaintiff concerning his arrest. (Defs.' Ex. 9 at 11.) By a written statement made in the presence of defendant Saccomanno and Lieutenant James A. Owens, on June 29, 1993, the plaintiff stated:

> I was in a area where the Police were under surveillance. My girlfriend lives in this area. When the Officers approached me, I became arrogant to think they were approaching me. My arrogance led them to arrest me for trespassing. The Officer told the Desk Sergeant that I had no occupation and to just appear July 6, 1993

to Night Court. I asked if I should Report this to my Superior's [sic] and the Officer said not to volunteer this information and to just pay the Summons.

(Defs.' Ex. 22.)

On June 29, 1993, the Assistant Commissioner of the Bureau of Investigations and Trials of the Fire Department prepared a report regarding the plaintiff's June 11, 1993 arrest and his failure to report the arrest. (Defs.' Ex. 16.) When he received a copy of the report, Fusco, then chief of the Fire Department, consulted with the First Deputy Commissioner and Chief of Operations. (Dep. Tr. of Anthony Fusco, dated June 23, 1993, annexed as Defs.' Ex. 23 at 7–9; Aff. of Anthony Fusco, sworn to on June 8, 1995 ("Fusco Aff.") ¶¶ 4, 13.) Based upon his experience of over thirty years with the Fire Department and his consultation with the Deputy Commissioner and the Chief of Operations, Fusco suspected illegal drug use by the plaintiff and determined that the plaintiff should undergo a urinalysis to test for the presence of drugs. (Defs.' Ex. 23 at 17, 25–26, 28; Fusco Aff. ¶¶ 11–17.)

The determination to have the plaintiff submit to a drug test was based upon a combination of factors, including the plaintiff's arrest for trespassing in a known drug location and his failure to report it together with the plaintiff's three absences during his six weeks of probationary service and the fact that the plaintiff had missed several medical tests prior to being medically qualified for appointment. (*Id.*) On July 1, 1993, less than two full business days after being notified of the plaintiff's arrest and his failure to report his arrest, defendant Saccomanno was directed by Chief Bauer, the Executive Officer at the Bureau of Training, to have the plaintiff report to the Fire Department Bureau of Health Services. (Defs.' Ex. 9 at 27–28.)

The Fire Department All Unit Circular No. 202A regarding "Department Policy Regarding Drugs and Narcotics" provides:

> (1) members shall not use, or have in their possession, narcotics, tranquilizers, opiates, cocaine, marijuana, hallucinogens, methadone, amphetamines or barbiturates, or other controlled substances, or parapher-

nalia used to administer any of the above, except with the approval of the Chief Medical Officer. . . .

(3) members shall not report for or be on duty in a drug induced state or while under the influence of a drug which alters alertness, judgment, personality, responses or physical agility. Members will be presumed to be "under the influence" if such a drug is found in their systems.

(4) The same procedure utilized when a member is suspected to be under the influence of alcohol shall be implemented in instances where illegal and/or unauthorized drug use is suspected. *When reasonable grounds exist for believing members are using or have used illegal and/or unauthorized drugs, they shall be required to undergo blood or other related tests.*

(Defs.' Ex. 24 (emphasis added).)

The Fire Department All Unit Circular No. 202R regarding "Court Decisions and Department Policy Regarding Alcoholic Beverages" provides:

II.(C) Members shall not report for duty in an intoxicated condition, or while under the influence of an intoxicating beverage.

II.(D) Blood–Alcohol Tests will be required when reasonable grounds exist for believing members are intoxicated or are under the influence of an intoxicating beverage, while on duty . . .

(Defs.' Ex. 25.)

On July 1, 1993, the plaintiff was escorted to the Bureau of Health Services. (Defs.' Ex. 9 at 30.) At that time, the plaintiff completed and signed a Fire Department Testing Questionnaire, (Defs.' Ex. 26), and, before he provided a urine sample, consented and granted permission for a specimen to be taken to determine the presence of controlled substances and other intoxicants. (Defs.' Ex. 26, 27.) The questionnaire provided, among other things, just above Nocera's signature: "All positive specimens are retained for a minimum of two months. You have the right to have your specimen retested at another laboratory at your own expense. . . ." (*Id.*)

The plaintiff also signed a "Drug Screen Requisition" which included the following consent above his signature: "I grant permission for a specimen to be taken to determine the presence of controlled substances and other intoxicants." (Defs.' Ex. 27.)

On Friday, July 2, 1993, the day after the plaintiff's drug test, the plaintiff was absent without leave, and defendant Fusco was so notified. (Defs.' Ex. 23 at 38; Defs.' Ex. 28.)

On Tuesday, July 6, 1993, the plaintiff was again absent without leave, although he did call. (Defs.' Ex. 28.)

The defendants maintain that by July 6, 1993, a determination was made to terminate the plaintiff's probationary employment because the plaintiff had failed to report his arrest and had been away without leave on July 2 and July 6, 1993. (Defs.' Ex. 23 at 38; Fusco Aff. ¶¶ 19–22.) On Wednesday, July 7, 1993, the plaintiff was absent without leave again. (Defs.' Ex. 28.) On July 7, 1993, the Bureau of Health Services was notified that the plaintiff tested positive for cannabinoids. (Defs.' Ex. 29.)

On July 8, 1993, the plaintiff signed a resignation from his position as a probationary fire fighter in lieu of termination. (Defs.' Ex. 30.)

The criminal trespass charges against the plaintiff were dismissed on July 27, 1993. (Complaint at ¶ 50.)

### III.

All parties move for summary judgment on the plaintiff's claim that subjecting the plaintiff to a drug urinalysis test was an unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments, and thereby a violation of 42 U.S.C. § 1983.

■ All parties agree that a compelled drug urinalysis test is a search and seizure that must satisfy the reasonableness standard of the Fourth Amendment as applied to the states by the Fourteenth Amendment. *See Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 617, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989); *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665, 109 S.Ct. 1384, 1390–91, 103 L.Ed.2d 685 (1989); *McDonell v. Hunter*, 809 F.2d 1302, 1307 (8th Cir.1987); *Everett v. Napper*, 833 F.2d 1507, 1511 (11th Cir.1987); *Copeland v.*

*Philadelphia Police Dep't,* 840 F.2d 1139 (3d Cir.1988).[3]

■ It is well established that because of the important government interests in assuring that employees in safety-sensitive jobs are free from the effects of drug use in connection with performing their jobs and because of the lower expectations of privacy for employees performing such jobs, the government need not have a warrant or probable cause before requiring such an urinalysis test. *See Skinner,* 489 U.S. at 622–33, 109 S.Ct. at 1416–22; *Von Raab,* 489 U.S. at 666–77, 109 S.Ct. at 1391–92; *Ford v. Dowd,* 931 F.2d 1286, 1292 (8th Cir.1991); *Security and Law Enforcement Employees, Dist. Council 82 v. Carey,* 737 F.2d 187, 202 (2d Cir.1984).

■ When a drug urinalysis test is part of a systematic, uniformly applied program, it may meet the reasonableness requirement without requiring a showing of reasonable suspicion that an individual required to be tested had been using drugs. *See Skinner,* 489 U.S. at 624, 109 S.Ct. at 1417; *Von Raab,* 489 U.S. at 666–68, 109 S.Ct. at 1391–92.

■ Where, as here, however, the public employer singles out such an employee in a safety sensitive job and requires the employee to submit to a drug urinalysis test, the public employer must have "reasonable suspicion" of drug use by the person subjected to the test. *See Copeland,* 840 F.2d at 1144; *Everett,* 833 F.2d at 1511; *Coppinger v. Metro–North Commuter R.R.,* 861 F.2d 33, 35 (2d Cir.1988).

■ Reasonable suspicion is a lower standard than probable cause. *Ford,* 931 F.2d at 1292; *Burka v. New York City Transit Auth.,* 739 F.Supp. 814, 831–832 (S.D.N.Y. 1990). Reasonable suspicion must be based on an analysis of all the circumstances as they appeared to the official making the judgment at the time. *See Carey,* 737 F.2d at 207.

■ In determining reasonable suspicion, "officials 'must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience.'" *Carey,* 737 F.2d at 205 (quoting *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982)); *see also Coppinger,* 861 F.2d at 35. Factors that may affect the reasonableness of the official's suspicion are the nature of the tip or information; the reliability of the informant; the degree of corroboration; and other facts contributing to suspicion or lack thereof. *Carey,* 737 F.2d at 205; *see also Copeland,* 840 F.2d at 1144.

■ The parties do not dispute that the defendants needed individualized reasonable suspicion to believe that the plaintiff was using drugs before requiring the drug urinalysis test in this case. They part ways on whether the defendants had such reasonable suspicion based on specific articulable facts. I find that the defendants had such reasonable suspicion.

■ Before ordering the plaintiff's urinalysis test, Chief Fusco had received the report from the Fire Department's Bureau of Investigations and Trials. This report indicated that the plaintiff had been arrested for trespassing at what the Housing Police described as a "known drug location." The plaintiff was arrested for trespassing on June 11, 1993. The Fire Department was notified by the Division of Criminal Justice on June 29, 1993. As of that time, contrary to Fire Department rules, the plaintiff had not reported his arrest. He admitted to the arrest only after being confronted with it. While certainly not dispositive, an arrest in a known drug location is a factor that can be taken into account in determining reasonable suspicion. *See, e.g., United States v. Lender,* 985 F.2d 151, 154 (4th Cir.1993); *United States v. Moore,* 817 F.2d 1105, 1107 (4th Cir.1987); *see also United States v. Constantine,* 567 F.2d 266, 267 (4th Cir.1977).

The cases on which the plaintiff relies do not establish that an arrest in a known drug location is not an objective factor that can be

---

**3.** While the defendants argue that the plaintiff consented to the urinalysis test, the plaintiff denies that he voluntarily consented to the search and argues that he only took the test because he was ordered to do so by his superior. Whether he voluntarily consented to the search raises issues of fact that cannot be resolved on the motion for summary judgment.

taken into account in determining reasonable suspicion. Rather, these cases concern whether such a factor alone establishes probable cause or reasonable suspicion. *Cf. Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (mere proximity to others independently suspected of criminal activity did not establish probable cause; police lacked reasonable suspicion with respect to frisk for weapons); *Fiorenza v. Gunn,* 140 A.D.2d 295, 527 N.Y.S.2d 806 (2d Dept.1988) (mere presence in area where identified employees were reportedly meeting to drink and take drugs did not constitute reasonable individualized suspicion with respect to the petitioner).

When the plaintiff failed to report his arrest, Chief Fusco could reasonably conclude that the plaintiff was attempting to conceal the fact of his arrest and to forestall any follow up inquiries. While the plaintiff disputes whether he was arrested, as opposed to simply receiving a desk appearance ticket, his statement to the Department acknowledged that he was arrested. Chief Fusco had objective information from a reliable source—the arrest record itself. The arrest record was corroborated by the Department's investigation and the plaintiff's own statement indicating that he had been arrested. And while the plaintiff disputes that he was aware of the Department rule requiring such reports, Chief Fusco was entitled to rely on Department policy of which, under Department practice, the plaintiff was made aware at the Academy. Moreover, while the plaintiff asserts that he only received a Desk Appearance Ticket, under Department rules he was still required to report even a Desk Appearance Ticket.

Chief Fusco also relied on the fact that in less than two months as a probationary fire fighter the plaintiff had three absences, two of which were on Fridays. In addition, the investigation showed—and Chief Fusco relied upon—the fact that the plaintiff had cancelled several pre-appointment medical examinations. These were objective criteria which, in Chief Fusco's experience, he found supported a reasonable suspicion of drug use. While the plaintiff urges other explanations—including medical reasons for the absences—each circumstance could be considered a part of the totality of the circumstances that led Chief Fusco to conclude that the plaintiff was using drugs. *See also Copeland,* 840 F.2d at 1144 (allegations of drug use later recanted and uncorroborated still established reasonable suspicion to require drug urinalysis test of policemen); *Everett,* 833 F.2d at 1511–12 (uncorroborated allegation of drug use against fire fighter made by another fire fighter who was a confirmed drug dealer was sufficient to constitute reasonable suspicion to require a drug urinalysis test). What the Court of Appeals for the Eleventh Circuit said in *Everett* also applies in this case:

> The City has a compelling interest in having its firefighters free from drugs. Firefighters must be prepared to react and make decisions quickly in order to insure public safety. Under the circumstances articulated in this case, the standard used by the officials conducting the internal administrative investigation to determine who should be tested was reasonable.

*Id.* at 1511–12.

Therefore, under the totality of the circumstances, the defendants had reasonable suspicion based on objective, identifiable facts to require the plaintiff to take a drug urinalysis test. Summary judgment is justified for the defendants and against the plaintiff dismissing the plaintiff's claim for a violation of § 1983 based the claim that the test violated the constitutional prohibition against unreasonable searches and seizures.

## IV.

The defendants also move for summary judgment to dismiss the plaintiff's claim that he was deprived of a liberty interest because he was not afforded a "name-clearing" hearing to refute the results of the drug test.

The Court of Appeals for the Second Circuit explained the necessary elements of such a claim:

> A government employee's liberty interest is implicated where the government dismisses him based on charges "that might seriously damage his standing and associations in the community" or that might

impose "on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities." ... In addition, the charges against the employee must be made "public" by the government employer, and the employee must allege that the charges are false. Where the employee's liberty interest is implicated, he is entitled under the due process clause to notice and an opportunity to be heard.

*Brandt v. Board of Cooperative Educ. Servs.,* 820 F.2d 41, 42–43 (2d Cir.1987) (citations omitted); *Burka v. New York City Transit Auth.,* 739 F.Supp. 814, 833–834 (S.D.N.Y. 1990); *Ludd v. Rockville Centre Union Free Sch. Dist.,* 1990 WL 31650, at *11–12 (E.D.N.Y.1990), *reh'g,* 1990 WL 137388 (E.D.N.Y.1990).

 The defendants argue that the plaintiff has no liberty interest because the drug test results are accurate and because they gave the plaintiff opportunities to retest the sample if he so desired. The plaintiff has refused those opportunities. Nevertheless, *Brandt* dictates that a plaintiff need only "raise the issue of falsity regarding the stigmatizing charges—not prove it—in order to establish a right to a name-clearing hearing." 820 F.2d at 43. *See also Burka,* 739 F.Supp. at 833. Therefore, the defendants are not entitled to summary judgment on that ground.

 The defendants are correct, however, that the plaintiff must show that the alleged defamation or stigma occurred "in the course" of termination or suspension. *Paul v. Davis,* 424 U.S. 693, 710, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976); *Siegert v. Gilley,* 500 U.S. 226, 233–34, 111 S.Ct. 1789, 1793–94, 114 L.Ed.2d 277 (1991); *Brandt,* 820 F.2d at 45; *see also Burka,* 739 F.Supp. at 833; *Sims v. City of New London,* 738 F.Supp. 638, 646–47 (D.Conn.1990) (no constitutional claim for employee who resigns and was not discharged). If an employee resigns rather than being terminated, the employee cannot claim that his liberty was taken away without due process. *See Hargray v. City of Hallandale,* 57 F.3d 1560, 1567 (11th Cir.1995); *Angarita v. St. Louis County,* 981 F.2d 1537, 1544 (8th Cir.1992);

*Christie v. United States,* 207 Ct.Cl. 333, 518 F.2d 584, 588–89 (1975); *see also Codd v. Velger,* 429 U.S. 624, 628, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977) (per curiam).

In this case, the plaintiff signed a written resignation and admitted at his deposition that he resigned. *See* Def. Ex. 30; Def. Ex. 5 at 219. The plaintiff testified that he was given "an option to either be terminated or to resign." (Defs.' Ex. 5 at 209.) He testified that he chose to resign, (*Id.*), and that his father subsequently told him it was a mistake, (*Id.* at 219.).

 A resignation from public employment could be sufficiently involuntary to trigger the protections of the due process clause if it were obtained by coercion, duress, or material misrepresentations. *See Hargray,* 57 F.3d at 1567–68 (listing cases on whether resignations were coerced for purposes of a deprivation of a property interest without due process); *Angarita,* 981 F.2d at 1544 ("A resignation is presumed voluntary, unless the employee comes forward with sufficient evidence to establish that the resignation was involuntarily extracted."). In this case, however, there is no evidence proffered by the plaintiff to show that his resignation—which he indisputably signed and admitted to at his deposition—was the result of coercion, duress, or material misrepresentation. While the plaintiff asserts that his resignation was not voluntary, he offers no facts to support such a claim. In response to a motion for summary judgment where, as here, the moving party offers sufficient evidence to support its claim, the nonmoving party must come forward with evidence that would be sufficient to support a jury verdict in his favor. Mere conclusory allegations are not sufficient. *See Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995); *Dister v. Continental Group,* 859 F.2d 1108, 1114 (2d Cir.1988); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985).

The choice the defendants afforded the plaintiff, a probationary fire fighter, between resignation or termination—the only fact that the plaintiff relies upon to show coercion—does not alone constitute duress or coercion. Because the government has the

legal right to terminate a probationary employee, and indeed the plaintiff has withdrawn any claims for a violation of a property interest, a threat to take an action that the public employer is legally entitled to take cannot constitute duress or coercion. *See Stefandel v. Sielaff,* 176 A.D.2d 651, 575 N.Y.S.2d 304 (1st Dept.1991); *Faillace v. Port Auth.,* 130 A.D.2d 34, 42, 517 N.Y.S.2d 941, 946 (1st Dept.1987); *Cacchioli v. Hoberman,* 31 N.Y.2d 287, 292, 291 N.E.2d 117, 119, 338 N.Y.S.2d 865, 868 (1972).

In *Hargray v. City of Hallandale,* 57 F.3d 1560 (11th Cir.1995), the court found that a claim for deprivation of property without due process by a former city employee should be dismissed despite allegations of coercion. Considering the totality of the circumstances and using an objective standard to determine coercion, the court found that the former employee was not coerced despite a threat in that case that the employer might press criminal charges. The court ruled that "resignations can be voluntary even where the only alternative to resignation is facing possible termination for cause or criminal charges. Resignations obtained in cases where an employee is faced with such unpleasant alternatives are nevertheless voluntary because 'the fact remains that plaintiff had a choice. [Plaintiff] could stand pat and fight.'" 57 F.3d at 1568 (citation omitted).[4] The plaintiff had the same choice here.

Hence, in this case, the plaintiff cannot prevail on his deprivation of liberty claim because the evidence establishes that the plaintiff resigned and was not terminated. The plaintiff has failed to adduce any evidence that his resignation was coerced.

■ The plaintiff is also not entitled to relief on this claim because he has failed to show that state procedural remedies are inadequate.

A plaintiff alleging a denial of procedural due process must prove as an essential element of the claim that state procedural remedies are inadequate. This requires a court to consider not simply the administrative proceedings that result in alleged injury but the totality of state process available, including means that serve to "redress administrative error."

*Ludd,* 1990 WL 31650, at *12 (citations omitted).

In *Giglio v. Dunn,* 732 F.2d 1133 (2d Cir.), *cert. denied,* 469 U.S. 932, 105 S.Ct. 328, 83 L.Ed.2d 265 (1984), the Court of Appeals for the Second Circuit concluded that a teacher could challenge the voluntariness of his resignation in an Article 78 proceeding under the N.Y.C.P.L.R. and that that opportunity provided all the process constitutionally due. *See also Campo v. New York City Employees' Retirement Sys.,* 843 F.2d 96, 102 (2d Cir.1988). In *Ludd,* Judge Raggi specifically found that Article 78 is an available procedural mechanism for a plaintiff complaining about the failure to hold a name-clearing hearing. "Requests for name-clearing hearings are, in fact, among those routinely entertained pursuant to Article 78." *Ludd,* 1990 WL 31650, at *12 (citations omitted).

■ The plaintiff has proffered no explanation why this process provided by the state was in any way constitutionally inadequate. Therefore, the plaintiff's claim of deprivation of liberty must also be dismissed for failure to demonstrate inadequate state procedural remedies.[5]

---

4. While the plaintiff relies on *EEOC v. American Express Co.,* 681 F.Supp. 216 (S.D.N.Y.1988), the issue in that case was whether a release in an age discrimination case satisfied "the more subtle standards developed by the courts to evaluate the knowing and voluntary nature of ADEA releases." *Id.* at 218. Those factors are not related to the issues in this case.

5. This conclusion that Article 78 provides adequate state procedural due process in this case for this hearing does not offend the doctrine of nonexhaustion of state remedies set forth in *Pat-*

*sy v. Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) (state administrative remedies), and *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (state judicial remedies), as the Court of Appeals for the Second Circuit has already explained. *See Campo,* 843 F.2d at 103. The plaintiff is not required to exhaust state remedies but, if there are adequate state remedies, the plaintiff cannot complain that he was denied procedural due process based on the absence of such remedies.

## V.

Each of the individual defendants is also entitled to judgment dismissing the claims against them based on qualified immunity.

Qualified immunity shields government officials from liability for civil damages when they are sued in their personal capacity as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, insubstantial lawsuits. *Lennon v. Chief William P. Miller of the City of Troy,* 66 F.3d 416, 420 (2d Cir.1995) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)); *Malsh v. Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995). Government officials performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *see also Zavaro v. Coughlin,* 970 F.2d 1148, 1153 (2d Cir.1992). Even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was "objectively reasonable" for him to believe that his actions were lawful at the time of the challenged act. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987); *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987) (citing *Malley v. Briggs,* 475 U.S. 335, 340–41, 106 S.Ct. 1092, 1095–96, 89 L.Ed.2d 271 (1986)). The objective reasonableness test is met— and the defendants are entitled to qualified immunity—if "officers of reasonable competence could disagree" on the legality of the defendants' actions. *Malley,* 475 U.S. at 341, 106 S.Ct. at 1096; *accord Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991), *cert. denied sub nom. Lillis v. Golino,* 505 U.S. 1221, 112 S.Ct. 3032, 120 L.Ed.2d 902 (1992). Further, the use of an "objective reasonableness" standard permits qualified immunity claims to be decided as a matter of law. *Cartier v. Lussier,* 955 F.2d 841, 844 (2d Cir.1992).

The objective reasonableness standard is suitable for determination on summary judgment. As the Court of Appeals for the Second Circuit explained:

> The rule requiring the judge to resolve questions of reasonableness on summary judgment in qualified immunity cases where the material facts are not in dispute is consistent with the doctrine's purpose of providing immunity from suit, as well as a defense to liability.... If there is no dispute about the material facts, the district court should assess the reasonableness of the defendant's conduct under the circumstances presented in order to determine on summary judgment whether defendants are entitled to qualified immunity.

*Lennon,* 66 F.3d at 421. When the issue is the objective reasonableness of the defendants' conduct, "if the court determines that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendants' conduct under the circumstance, summary judgment for the officers is appropriate." *Id.*

With respect to the plaintiff's claim that the required drug urinalysis test violated his constitutional right to be free from unreasonable searches and seizures, the plaintiff has met the first test to overcome qualified immunity because the law was clearly established, as the parties agree, that public employers must have reasonable suspicion before requiring an individualized drug test. The plaintiff, however, has failed to demonstrate that no officer of reasonable competence could have made the same choice in similar circumstances. The standard to be applied by the officers was individualized reasonable suspicion, a standard less than probable cause, and which in this case was based on several articulable facts pointing to drug use by the plaintiff. The Court has already found those facts sufficient to establish reasonable suspicion in this case. At the very least, reasonable officers could disagree about the existence of reasonable suspicion to authorize the test in these circumstances, which entitles the defendants to qualified

immunity. *See Lennon*, 66 F.3d at 423–25.[6]

With respect to the plaintiff's claim that he was deprived of liberty without due process, he cannot overcome the defense of qualified immunity because he has not established a constitutional right. While the deprivation of liberty only after due process is a clearly established right, it has not been applied in the context of resignations by public employees, nor has the availability of the Article 78 proceeding been found to be inadequate state due process. To the extent that there was any such right, it could not be found to be clearly established. Moreover, not providing such a hearing in the circumstances of this case, given the absence of clear guidance requiring such a hearing, could not be considered to be objectively unreasonable.

### VI.

 Summary judgment must also be granted for the New York City Fire Department on an independent basis. To hold a municipality liable under § 1983 for the unconstitutional acts of its employees, the plaintiff must plead and prove that his constitutional rights were violated, that the alleged actions by the employees were the result of an official policy, custom, or practice of the municipal defendant, and that the policy, custom, or practice caused the plaintiff's alleged injuries. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989); *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690–695, 98 S.Ct. 2018, 2035–38, 56 L.Ed.2d 611 (1978); *Blum v. Koch*, 716 F.Supp. 754, 758–59 (S.D.N.Y.1989). Proof of a single incident of unconstitutional activity is insufficient to demonstrate the existence of a policy. *City of Oklahoma v. Tuttle*, 471 U.S. 808, 821, 105 S.Ct. 2427, 2435, 85 L.Ed.2d 791 (1985) (opinion of Rehnquist, J.).

Here, the New York City Fire Department could not be liable because there was no underlying violation. Moreover, there is no evidence that any alleged unconstitutional acts were part of a municipal policy, practice

or custom. The plaintiff has not even alleged what policy, practice, or custom caused his injuries, much less presented any evidence to support such an allegation. Indeed, with respect to the required drug urinalysis test, the Fire Department regulations specifically provide that before requiring such a test, the authorizing office must have "reasonable grounds" for authorizing such a test. That policy is not unconstitutional under the standards all the parties agree should be applied to determining the constitutionality of individual drug tests.

### CONCLUSION

The defendants' motion for summary judgment dismissing all remaining claims against them is **GRANTED**. The plaintiff's motion for summary judgment is **DENIED**. The clerk is directed to enter judgment dismissing this action and closing the case.

**SO ORDERED.**

---

**6.** The plaintiff argues that qualified immunity was unavailable because the defendants did not consult an attorney before authorizing the drug test. There is no such requirement. Here the test was ordered only after Chief Fusco consulted with two other experienced senior Fire Department officials. There is no requirement that the consultation include a lawyer.